AMANDA J., a Minor, By and Through Her Guardian Ad Litem, ANNETTE J., Plaintiff–Appellant,

v.

CLARK COUNTY SCHOOL DISTRICT, and Nevada State Department of Education, Defendants–Appellees.

No. 99–17157.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 2001

Filed Aug. 13, 2001

Amended Sept. 25, 2001

Geralyn M. Clancy, (argued) Varma & Clancy, Sacramento, California, for the plaintiff-appellant.

Donna Mendoza Mitchell, (argued) Office of the General Counsel Clark County School District, Las Vegas, Nevada, for defendant-appellee Clark County School District.

Melanie Meehan–Crossley (on brief), Deputy Attorney General of the State of Nevada, Carson City, Nevada, for the defendant-appellee Nevada State Department of Education.

Before: HAWKINS, McKEOWN, and WARDLAW, Circuit Judges.

## ORDER

The Opinion filed August 13, 2001, slip op. 10681, and appearing at 260 F.3d 1106, 2001 WL 902125, is amended as follows:

Please see attached Amended Opinion.

With these amendments, the panel has voted unanimously to deny the petition for rehearing and to reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

## OPINION

WARDLAW, Circuit Judge:

Amanda J., a minor, by and through her mother and Guardian Ad Litem, Annette J., appeals from the district court's decision to affirm the State Review Officer's ("SRO") conclusion that she received a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1487 ("IDEA" or "the Act"). As part of Nevada's two-tiered administrative review process, the SRO reversed the State Hearing Officer's ("HO") determination that the Clark County School District (the "District") denied Amanda a FAPE. The HO's determination would have provided Amanda reimbursement for the cost of the 1996 assessments indicating autism and the cost of an in-home program funded by her parents from April 1, 1996—July 1, 1996, as well as compensation for the inappropriate language services rendered during her time in the District.

We must initially decide a question of first impression for our court: what level of deference do we give to the state agencies involved in a two-tiered review process when each reaches a different result predicated on a credibility determination? In other words, to which administrative body do we accord the "due weight" standard of review for IDEA cases, established by *Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)? We then turn to a question of more significance to the growing number of parents of autistic children for whom early detection and early parental involvement in education is critical to their ability to overcome the disorder: whether the District's failure to give Amanda's parents copies of the evaluations indicating the possibility of autism and the need for further psychiatric evaluations when the District learned of the possible diagnosis violated the procedural requirements of the IDEA. We hold that it did. By preventing Amanda's parents from fully and effectively participating in the creation of an individualized education program ("IEP") for Amanda, the District made it impossible to design an IEP that addressed Amanda's unique needs as an autistic child, thereby

denying Amanda a FAPE. We further hold that the district court erred by according greater deference to the credibility determinations of the State Review Officer than to those of the Hearing Officer in applying the due weight standard. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## I. Statutory Background

The IDEA provides states with federal funds to help educate children with disabilities if they provide every qualified child with a FAPE that meets the federal statutory requirements.[1] Congress enacted the IDEA "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(c) (1994).

In addition to establishing substantive requirements, the IDEA also includes procedural safeguards which, if violated, may prevent a child from receiving a FAPE. Among the most important procedural safeguards are those that protect the parents' right to be involved in the development of their child's educational plan. Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know. To guarantee parents the ability to make informed decisions about their child's education, the IDEA grants them the right to "examine all relevant records" relating to their child's "identification, evaluation, and educational placement," as well as "to obtain an independent educational evaluation" of their child if they disagree with what the school district or state agency has found. 20 U.S.C. § 1415(b)(1)(A). "[P]arents have the right to 'present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of [a FAPE] to such child.'" 20 U.S.C. § 1415(b)(1)(E).[2] After making their complaint, the parents are entitled to "an impartial due process hearing ... conducted by the State educational agency or by the local educational agency or an intermediate educational unit, as determined by State law or by the State educational agency," 20 U.S.C. § 1415(b)(2), and if either party is dissatisfied with the state educational agency's review, they may bring a civil action in state or federal court, 20 U.S.C. § 1415(e)(2).

## II. Autism

According to two studies conducted in the mid–1980s, 3.3 of every 10,000 children suffer from autism.[3] Autism is a developmental disorder of neurobiological origin that "generally has lifelong effects on how children learn to be social beings, to take care of themselves, and to participate in the community." National Research Council, *Educating Children With Autism* 9 (Catherine Lord & James P. McGee,

---

1. The facts of this case took place in 1995; therefore, despite the revision of the IDEA in 1997, this opinion will reference the statute in place at the time of the events in question. *See Adams v. State of Oregon*, 195 F.3d 1141, 1148 n. 2 (9th Cir.1999) (refusing to apply the 1997 amendments to events preceding their effective date).

2. Parents may also request copies of records if failure to provide such copies would effectively prevent the parents from exercising their right to inspect and review the records. *See* 34 C.F.R. § 300.562(B)(2) (1995).

3. Centers for Disease Control and Prevention, *Vaccine Fact Sheets*, (2000), *available at* http://www.cdc.gov/od/nvpo/fs_table-VII_doc2.htm.

eds., National Academy Press 2001).[4] The disorder is present from birth, or very early in development, and affects the child's ability to communicate ideas and feelings, to use her imagination, and to establish relationships with others. *Id.* No single behavior is characteristic of autism, and no single known cause is responsible for its onset. *Id.* Perhaps most distressingly, currently there is no cure. *Id.*

Although autism manifests itself in different ways, its symptoms in children are often measurable by eighteen months of age. *Id.* at 20. The main characteristics that differentiate autism from other developmental disorders include "behavioral deficits in eye contact, orienting to one's name, joint attention behaviors (e.g., pointing, showing), pretend play, imitation, nonverbal communication, and language development." *Id.* According to the National Academy of Sciences, "[w]ith adequate time and training, the diagnosis of autism can be made reliably in two-year-olds by professionals experienced in the diagnostic assessment of young children" with autistic disorders. *Id.* at 3. Early diagnosis is crucial because education (of children as well as of parents and teachers) is the primary form of treatment, and the earlier it starts, the better. *Id.* at 9. Education covers a wide range "of skills or knowledge-including not only academic learning, but also socialization, adaptive skills, language and communication, and reduction of behavior problems-to assist a child to develop independence and personal responsibility." *Id.*

Without early identification and diagnosis, children suffering from autism will not be equipped with the skills necessary to benefit from educational services. *Id.* at 170. A report by the National Research Council analyzed ten educational intervention models for children with autistic disor-

ders. All ten programs emphasized "the importance of starting intervention when children are at the earliest possible ages." *Id.* at 120. These studies showed that intensive early intervention "makes a clinically significant difference for many children." *Id.* at 137. All of the models presented "positive and remarkably similar findings, which included better-than-expected gains in IQ scores, language, autistic symptoms, future school placements, and several measures of social behavior." *Id.* Further, "at least two retrospective studies have found less restrictive placement outcomes for children who began intervention at earlier rather than later ages." *Id.* at 120. Thus, the available research strongly suggests that intensive early intervention can make a critical difference to children with autistic disorders. *Id.* at 132.

### III. Amanda J.

Amanda J. was born in 1991. She and her family lived in Las Vegas, Nevada, in the Clark County School District, until they moved to California in October 1995. On January 18, 1994, when Amanda was two years old, she was evaluated by a psychologist at the Special Children's Clinic, who found her to be "moderately low" in communication and daily living skills and "adequate" in socialization and motor skills. The psychologist recommended that Amanda be placed in the District's early childhood program prior to her third birthday to determine her eligibility for special education and to promote her language-based needs.

On March 21, 1995, Amanda was evaluated by psychologist Mark Kenney, and speech pathologist Christy Zuckerman, both of whom worked for the District. Amanda's parents attended all of her eval-

4. *Also available at* http:// www.nap.edu/books/0309072697/html.

uation sessions. Kenney's written report indicated that Amanda's results on the Autism Behavior Checklist (ABC) were "mixed." He noted that

> [h]er mother reported that she whirled herself for long periods of time, did not play with toys appropriately, seemed not to hear, lunged/darted about with spinning, toe-walking, etc., had severe temper tantrums, had not developed friendships, got involved with "rituals" such as lining things up, had communication problems, and had strong reactions to changes in routine/environment.

Kenney also noted that Amanda's social skills were generally below average for her age. Kenney concluded that Amanda was developmentally delayed and recommended an eligibility assessment for special education, a coordinated reward/consequence system to improve her behavior problems, speech and language services, parental training, and further evaluation by a child psychiatrist. These recommendations were recorded in a written report, a copy of which was not given to Amanda's mother. In addition, Amanda's mother says Kenney never discussed these recommendations with her. Kenney claims that he did.

Zuckerman found that Amanda qualified as "severely autistic" under the Childhood Autism Rating Scale, and recommended speech and language therapy as well as further assessments in other areas. She also believed that "[s]pecific activities should be developed and demonstrated in the classroom to stimulate social interaction and the development of communication skills." Zuckerman observed that Amanda was "non-verbal" and engaged in "random non-directed babbling." She was, however, able to imitate actions and sounds from a videotape. Zuckerman had no documentation establishing that she told Amanda's mother of the severe autism rating, but she testified that her general practice was to discuss such results with the child's parents. According to Amanda's mother, Zuckerman never contacted her to discuss her findings.

On March 30, 1995, Amanda was evaluated by the school nurse, who found no health problems other than a concern for Amanda's hearing abilities. Amanda's mother did not consent to an audiological evaluation.

On April 6, 1995, an eligibility team determined that Amanda was eligible for special education due to her difficulties in the areas of receptive or expressive language, cognitive ability, self-help, and social or emotional condition. The team included Kenney, a special education teacher, and a local agency coordinator. Once Amanda had been deemed eligible for special education, but prior to the initial IEP meeting, Amanda's mother requested copies of Amanda's assessment reports. The District did not send her any records until after the initial IEP was completed, and at that time she received only a two-page summary of Kenney's observations.

On May 6, 1995, the initial IEP meeting was held with Amanda's parents, an early childhood special education teacher, and a District representative. The IEP team recognized that Amanda "demonstrated delays in language, cognitive, social skills, and self-help." Goals of "toilet training, matching colors and shapes, establishing eye contact, making choices, and following classroom activities and rules" were established. The IEP placed Amanda in a specialized early childhood special education program "to develop emerging skills to generalize to a large group-home setting," and included speech and language therapy "as needed." At the IEP meeting, Amanda's parents were given notice of their parental rights and the procedural safe-

guards of both the IDEA and the Nevada Administrative Code.

Pursuant to the IEP, Amanda enrolled in the Extended School Year Program, a program designed to assist students in maintaining their current levels over the summer break. Amanda's parents felt that six to eight weeks of instruction would help Amanda continue to develop her emerging language skills. On September 12, 1995, sixteen days after school officially started, Amanda enrolled in Lynn Martin's[5] early childhood education class. While enrolled in Martin's class, Amanda had some speech sessions with therapist Marshall Fenig. Fenig's therapy "focused on attending to name, vocal or verbal interaction and following directions." On a review sheet dated November 17, 1995 (completed after Amanda's family moved to California and left the District), Fenig noted that, although Amanda "was not in therapy for a long period of time," adequate progress had been made. He recommended continued therapy.

On October 17, 1995, Amanda's early childhood teacher, Martin, requested an IEP review because she felt Amanda "was ready to have some of her goals invested [sic]. She needed to have some of her cognitive goals changed and she also was ready to have some fine motor goals added which weren't on the original IEP."

On October 23, 1995, a second IEP meeting was held. A state agency designee, Amanda's mother, and Martin were in attendance. During the review the IEP team noted that although Amanda had improved with respect to her toilet training goal, she still did not go to the bathroom independently, nor did she "use language to manipulate her environment," make eye contact when spoken to, or respond consistently to her name. Although Amanda was noted to display "amazing dexterity" in the fine motor skills area and had learned to copy a simple circle, she had poor pencil and scissors grasp. Amanda was also able to match all colors and shapes, work a simple inset puzzle, and complete complex tangrams. Individual instruction was recommended to improve her short attention span and lack of interest in cognitive games. The second IEP also recommended more specific speech and language therapy—requiring sixty minutes a week rather than "as needed."

Approximately eleven days after the second IEP assessment, on or around October 31, 1995, Amanda and her parents moved to California. Amanda had been enrolled in the District for forty-eight school days, twenty-six of which were in the Early Childhood Special Education Program. Soon after moving, Amanda was enrolled in the First Steps Preschool in Woodland, California,[6] in an interim placement program. Amanda's mother signed an authorization for release/exchange of information, which allowed Amanda's files to be transferred from the Siegle Diagnostic Center in Nevada to her preschool in California. The records were transferred on December 5, 1995,[7] and on December 15,

---

5. Martin had a master's degree in early childhood special education but no special training or experience with autistic children. Normally, she did not have autistic children in her class. Her classes usually contained children with a variety of speech and physical disorders, including children with Down's syndrome.

6. There is a discrepancy in the record regarding the date of Amanda's enrollment in the California school system. The SRO found that Amanda was placed in the preschool program on November 11, 1995, but the interim placement forms state that placement began on November 14, 1995.

7. Again, the record is unclear as to the date on which this transfer occurred. The SRO

1995, a Yolo County IEP team in Woodland reviewed the interim placement and determined Amanda was properly placed.

On December 15, 1995, Dr. Michael Harris, a physician and Amanda's uncle, referred Amanda to Dr. Robin Hansen, a professor of Pediatrics and the Director of Developmental and Behavioral Pediatrics at U.C.—Davis Medical Center, requesting that Amanda be evaluated because of characteristics denoting autism. Amanda was diagnosed as autistic for the first time on January 10, 1996, by Dr. Hansen, who referred Amanda's parents to Families for Early Autism Treatment and to the Alta Regional Center for a second opinion. On February 29, 1996, the Alta Regional Center confirmed the diagnosis of autism.

One day earlier, on February 28, 1996, Amanda's mother had Amanda evaluated by Jane Germ and her employee Melissa Travis from American River Speech and Hearing Associates. Amanda was diagnosed with a severe language delay. Six months of intensive speech therapy was prescribed. American River did not diagnose Amanda as autistic.

Amanda began an in-home intervention program with Vicki Wells using a discreet trial format[8] for fifteen hours a week on April 1, 1996. Amanda's parents funded this program.

On April 16, 1996, Amanda's parents requested an IEP review from the California school district. At the IEP meeting, Amanda's parents were given updated assessments from the Alta Regional Center and American River as well as copies of the Clark County School District's early reports indicating possible autism. When they finally saw copies of the District's reports, Amanda's parents learned for the first time that the District had detected the possibility of autism more than a year previously. The reports indicating the possible autism diagnosis were not mentioned in Kenney's two-page summary of Amanda's present levels of educational performance.

On April 24, 1996, Amanda was evaluated by Dr. Bryna Siegel, Associate Adjunct Professor and Director of Persuasive Developmental Disorders Clinic. Siegel confirmed that Amanda was autistic and recommended special preschool classes focusing on "her expressive and receptive language skills," the continuation of Wells' at home intervention for twenty hours a week, and the utilization of individual, weekly speech therapy.

On July 1, 1996, Alta Regional Center began funding Amanda's home intervention program. On October 17, 1996, another IEP meeting was held in California when Amanda's parents unilaterally decided to remove Amanda from the early intervention program so that she could visit a kindergarten class in another school district. A December 9, 1996 psychological report indicated that Amanda was progressing well in her academic skills, but still required considerable support from her teachers. On June 4, 1997, the IEP team met again and decided that Amanda should be placed in a regular kindergarten class, with additional individual speech therapy.

■ Amanda's parents requested a due process hearing in Nevada on October 24,

---

found that the records were transferred on December 11, but the Clark County records show that the files were transferred on December 5.

8. Discreet trial training ("D.T.T.") is one approach to educating children with autism. Developed by Dr. Ivar Lovaas, D.T.T. emphasizes early intervention, parental involvement, and treatment in non-professional settings, like the home or the community.

1997, to resolve whether Amanda had been correctly identified and whether she had received a FAPE. A due process hearing was held March 30–31, 1997. The Hearing Officer concluded that Amanda had been misidentified as developmentally delayed and had therefore been denied a FAPE. On June 28, 1998, the State Review Officer reversed, overturning the credibility determinations of the HO, concluding that Amanda's parents had been informed of the tests suggesting a diagnosis of autism. The SRO did not reach the procedural violations found by the HO. Amanda's family challenged the SRO's decisions in federal court. Construing this case as an appeal from an adverse administrative decision, the district court deferred to the factual and legal conclusions of the SRO and found that Amanda had neither been misdiagnosed nor denied a FAPE. It, like the SRO, did not address the procedural violations found by the HO. Amanda timely appealed.[9]

## IV. Standard of Review

■ This case requires us to conduct a multi-layered review of decisions of the district court, the Nevada State Review Officer, and the District's Due Process Hearing Officer. We review the district court's findings of fact for clear error even when they are based on the written record of administrative proceedings. *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir.1983); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir.1987). A finding of fact is clearly erroneous when the evidence in the record supports the finding but "the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burlington N., Inc.*, 719 F.2d at 307. Questions of law and mixed questions of fact and law are reviewed *de novo*, unless the mixed question is primarily factual. *Gregory K.*, 811 F.2d at 1310. We review *de novo* the question of whether a school district's proposed individualized education program provided a free appropriate public education. *Id.*

■ Under the IDEA, federal courts reviewing state administrative proceedings are to "receive the records of the administrative proceedings;" "hear additional evidence at the request of a party;" and "grant such relief as the court determines is appropriate" based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B). Thus, Congress intended "judicial review in IDEA cases [to] differ[ ] substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993). Complete *de novo* review, however, is inappropriate. *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990). As the Supreme Court has held, we are not free "to substitute [our] own notions of sound educational policy for those of the school authorities which [we] review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

9. Neither the District nor the Nevada State Department of Education asserted an Eleventh Amendment immunity defense at any point during this protracted litigation. After the Supreme Court's decision in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), we sought supplemental briefing on whether Eleventh Amendment immunity shielded either of the appellees. We conclude that both parties waived any rights they may have had to invoke the Eleventh Amendment defense of sovereign immunity by their extensive participation in this litigation. *See Hill v. Blind Indus. and Servs. of Md.*, 179 F.3d 754, 763 (9th Cir.1999) (holding that the state agency "unequivocally consented to the jurisdiction of the federal court by its conduct in appearing and actively litigating this case on the merits").

Because Congress intended states to have the primary responsibility of formulating each individual child's education, we must defer to their "specialized knowledge and experience" by giving "due weight" to the decisions of the states' administrative bodies. *Id.* at 206–08, 102 S.Ct. 3034.

Here we are confronted with a question the Supreme Court did not address when it articulated the "due weight" standard of review in *Rowley.* At the Due Process Hearing, the Hearing Officer concluded that: (1) the District failed to properly identify Amanda as an autistic child; (2) Amanda "gained very minimal educational benefits" from the program she attended; and (3) Amanda's parents should be compensated for past educational costs and awarded compensatory education. The State Review Officer disagreed and reversed the HO's decision, in part because the SRO disagreed with the credibility determinations of the HO. Thus we must decide to which state administrative body's decision we accord due weight when the decisions are at odds due to conflicting credibility determinations.

■ Because we have not previously addressed this question, we turn to our sister circuits for guidance. We find ourselves in agreement with the conclusions of the Second, Sixth, and Seventh Circuits that, in most situations, due weight must be given to the final decision of the state authorities, which in a two-tiered system is that of the SRO. *See Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.,* 736 F.2d 873, 877 (2d Cir.1984) ("We believe *Rowley* requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer."); *Thomas,* 918 F.2d at 624 ("[F]ederal courts are required to defer to the final decision of the state author-

ities...."); *Heather S. v. Wisconsin,* 125 F.3d 1045, 1052 (7th Cir.1997) (relying on *Thomas* and *Karl* in holding that due weight must be given to the final state determination in a two-tiered review process).

■ We also agree with our colleagues in the Second, Third, Fourth, and Tenth Circuits that when an SRO overturns the credibility determinations of an HO, due weight to the decision of the SRO is not warranted. The Fourth Circuit has held, for example, that in situations where two state administrative decisions differ only with respect to the credibility of a witness, the HO is "entitled to be considered prima facie correct." *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 105 (4th Cir.1992). In *Doyle,* the SRO reversed the HO's decision on the grounds that a particular witness's testimony was not credible even though the SRO had neither seen nor heard the witness testify. *Id.* at 104. Because reviewing the credibility determination of a fact-finder was "so far from the accepted norm of a fact-finding process designed to discover truth," the court accorded due weight to the HO on the credibility determination. *Id.* The court, however, was careful to limit its holding to cases in which "a state administrative appeals authority has departed from the fact-finding norm to such an extent as here." *Id.* at 105. *See, e.g., Springer v. Fairfax County Sch. Bd.,* 134 F.3d 659, 663 n. * (4th Cir.1998) (rejecting Springer's contention that, under *Doyle,* the decision of the HO must be given deference over that of the SRO because (1) the HO had "no special claim to deference" as it did in *Doyle;* (2) the HO's decision did not turn on witness credibility as it did in *Doyle;* and (3) the SRO provided specific reasons for departing from the HO's decision which the SRO in *Doyle* did not); *Delaware County Intermediate Unit No. 25 v. Martin K.,*

831 F.Supp. 1206, 1220 n. 17 (E.D.Pa.1993) ("*Doyle* did not create a per se rule to that effect. Rather, the *Doyle* court specifically limited its holding to the facts of that case.").

The Fourth Circuit is not alone in recognizing this exception to the general rule that deference should be accorded to the final decision of state authorities. According to the Second Circuit,

[t]here is no principle of administrative law which, absent a disagreement between a hearing officer and reviewing agency over demeanor evidence, obviates the need for deference to an agency's final decision where such deference is otherwise appropriate.

*Karl*, 736 F.2d at 877.

Similarly, the Third Circuit has held that the

credibility-based findings [of the HO] deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion. But beyond this rather narrow class of record-supported, credibility-based factual findings, we think that, to give the statute's language about "independent" decisions effect, the appeals panel must have much more leeway in reviewing other non-credibility based findings of the hearing officer. We will therefore defer to the appeals panel rather than the hearing officer in most circumstances.

*See Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 528–29 (3d Cir.1995) (citations omitted).[10]

The Tenth Circuit is also in accord:

[W]e will give "due weight" to the reviewing officer's decision on the issues with which he disagreed with the hearing officer, unless the hearing officer's decisions involved credibility determinations and assuming, of course, that the record supports the reviewing officer's decision.

*O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir.1998).

We join our colleagues in holding that in a two-tiered state administrative system due weight should be accorded to the final state determination—that of the SRO—unless the SRO's decision deviates from the credibility determination of a witness whom only the HO observed testify. Traditional notions of the deference owed to the fact finder compel this conclusion. The State Review Officer is in no better position than the district court or an appellate court to weigh the competing credibility of witnesses observed only by the Hearing Officer. This standard comports with general principles of administrative law which give deference to the unique knowledge and experience of state agencies while recognizing that a HO who receives live testimony is in the best position to determine issues of credibility.[11]

---

**10.** The *Carlisle* court stated that "[t]he circuits have split on the question whether federal district courts acting pursuant to *Rowley* should accord due weight to the trial level hearing officer or to the appeals panel where the two bodies differ and where the appeals panel may not have properly deferred to the hearing officer's findings." *Carlisle Area Sch. Dist.*, 62 F.3d at 527. We do not believe a circuit split exists on this question. The cases are consistent when read in light of *Doyle*'s limiting principle.

**11.** Although we "need not consider how much weight the trial court gave or ought to have given to the administrative findings" because this panel reviews the question of whether Amanda received a FAPE *de novo*, *Gregory K.*, 811 F.2d at 1311, we note that here the district court erred by concluding that as a matter of law due weight should be given to the final decision of the SRO, rather

## V. Free Appropriate Public Education

We next consider whether Amanda received a FAPE as required by the IDEA. The IDEA was created "to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child." *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. To accomplish this goal, Congress provides federal funding to states that have "in effect a policy that assures all children ... the right to a free appropriate public education." 20 U.S.C. § 1412(1). A FAPE is defined by the IDEA as

special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18). For purposes of the IDEA, "special education" means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings...." 20 U.S.C. § 1401(a)(16). Thus, a FAPE must be "tailored to the unique needs of the handicapped child." *Rowley*, 458 U.S. at 181, 102 S.Ct. 3034. Although the instruction provided need not be the "absolutely best or 'potential maximizing,'" *Gregory K.*, 811 F.2d at 1314 (citation omitted), "Congress did not intend that a school system could discharge its duty under the

[IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial," *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985) (holding that a child was denied a FAPE when the school failed to inform his parents of their procedural rights, including the right to an independent evaluation, and failed to develop an IEP which met the Act's requirements).

Our inquiry in determining whether Amanda received a free appropriate public education is twofold. We must determine first whether "the State complied with the procedures set forth in the Act" and, second, whether "the individualized educational program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207, 102 S.Ct. 3034.

### A. Procedural Compliance

Amanda argues that the district court and the SRO failed to consider the procedural violations of the Act and the Nevada Administrative Code, and therefore erroneously determined that Amanda received a FAPE. Specifically, Amanda contends: (i) the District's failure to allow her parents to examine all of the records used in identifying and addressing Amanda's disability violated the IDEA; (ii) its failure to include both her parents and a speech or language specialist in the multidisciplinary team that identified her as eligible for special education violated Nevada's administrative code; and (iii) these procedural violations denied her parents the ability to participate in the develop-

than deferring to the HO's credibility determinations.

ment of Amanda's IEP in an informed and effective manner thereby preventing Amanda from receiving a FAPE. We agree that the District violated the procedural requirements of the IDEA, something that the SRO and the district court did not consider, by failing to timely disclose Amanda's records to her parents—particularly those evaluations indicating possible autism and suggesting further psychiatric evaluation was needed. The District's egregious procedural violations denied Amanda a FAPE.

■■■ 20 U.S.C. § 1415 enumerates the procedural safeguards of the IDEA, the importance of which "cannot be gainsaid." *Rowley*, 458 U.S. at 205, 102 S.Ct. 3034. Procedural compliance is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important. As the Senate Committee on Labor and Public Welfare recognized,

> in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome. By changing the language [of the provision relating to individualized educational programs] to emphasize the process of parent and child involvement and to provide a written record of reasonable expectations, the Committee intends to clarify that such individualized planning Conferences are a way to provide parent involvement and protection to assure that appropriate services are provided to a handicapped child.

S.Rep. No. 94–168, at 11–12, *reprinted in* 1975 U.S.C.C.A.N. 674, 1435. By mandating parental involvement and requiring that parents have full access to their child's records, Congress sought to ensure that the interests of the individual children were protected. *See Rowley*, 458 U.S. at

208, 102 S.Ct. 3034. Not only will parents fight for what is in their child's best interests, but because they observe their children in a multitude of different situations, they have a unique perspective of their child's special needs.

Among the procedural rights guaranteed to parents by the IDEA is the right "to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child...." 20 U.S.C. § 1415(b)(1)(A). If parents disagree with the state agency's evaluation, they are entitled to "an independent educational evaluation of the child." *Id.* If the state educational agency "proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child," it must give the parents "written prior notice." 20 U.S.C. § 1415(b)(1)(C). The District must also establish "procedures designed to assure that the notice required by clause (C) fully informs the parents ... of all procedures available pursuant to this section." 20 U.S.C. § 1415(b)(1)(D).

■■■ The critical nature of the provisions protecting parental involvement is highlighted when they are considered in light of the stated purposes of the IDEA. To accomplish the IDEA's goal of ensuring that "all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs," 20 U.S.C. § 1400(c), those individuals who have first-hand knowledge of the child's needs and who are most concerned about the child must be involved in the IEP creation process. The procedural safeguards facilitate this objective. They also help to ensure that "the rights of children with disabilities

and their parents or guardians are protected." 20 U.S.C. § 1400(c).

Given the importance of the IDEA's procedural safeguards, it should be of no surprise that when a school district or other state agency violates "the procedural requirements of the Act by failing to develop an IEP in the manner specified, the purposes of the Act are not served, and the district may have failed to provide a FAPE." *W.G. v. Bd. of Trustees of Target Range Sch. Dist.*, 960 F.2d 1479, 1485 (9th Cir.1992). As the Supreme Court observed,

> [i]t seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.*, §§ 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP ... demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley*, 458 U.S. at 205–06, 102 S.Ct. 3034. Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, "will not render an IEP invalid." *Burilovich v. Bd. of Educ.*, 208 F.3d 560, 566 (6th Cir.), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000). On the other hand, "procedural inadequacies that result in the loss of educational opportunity," *W.G.*, 960 F.2d at 1484, or seriously infringe the parents' opportunity to participate in the IEP formulation process, *Roland M. v. Concord*

*Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990); *Hall*, 774 F.2d at 635; *Target Range*, 960 F.2d at 1483, or that "caused a deprivation of educational benefits," *Roland M.*, 910 F.2d at 994, clearly result in the denial of a FAPE. *See also Indep. Sch. Dist. Number 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir.1996) (quoting *Roland* with approval); *Doe v. Ala. State Dep't. of Educ.*, 915 F.2d 651, 662 (11th Cir.1990).

Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA. An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed. In *Target Range*, for example, we held that the Target Range School District "failed to fulfill the goal of parental participation in the IEP process and failed to develop a complete and sufficiently individualized educational program according to the procedures specified by the Act." 960 F.2d at 1485. Because Target Range had developed the IEP without the involvement of the child's parents, his teacher, or the school in violation of 20 U.S.C. § 1401(a)(19), its decision to place the child in its special education class did not take into consideration the recommendations from those who best knew the child. *Id.* at 1484. We therefore held that Target Range's refusal to include the child's parents in the IEP process denied the child a FAPE and that his parents were entitled to reimbursement for the cost of providing an appropriate education. *Id.* at 1485–86.

Here, the HO found that the District did not give Amanda's parents copies of the psychologist's and speech pathologist's reports finding mixed results on the autism tests, his recommendation to consider further psychiatric evaluation, or the speech and language assessment indicating "ex-

treme autism," all of which should have been disclosed under the IDEA. Although Amanda's parents did receive the "Summary of Present Levels of Performance" pursuant to their request after the initial IEP meeting, this document was merely a paraphrase of Kenney's report which omitted all reference to autism and to the recommendation to have a medical evaluation by a psychiatrist.

The first time Amanda's parents saw the reports indicating possible autism was in April 1996 during an IEP review in Woodland, California, after the files had been transferred from the District in December 1995. At the due process hearing before the HO, Kenney testified that, according to his "usual practices," he had considered Zuckerman's report before writing his own. He also testified that he told Amanda's mother the results over the phone, including the possibility that Amanda was autistic. The HO did not believe him, and found that "[a]pparently Mr. Kenney had no knowledge of the results of Ms. Zuckerman's speech and language evaluation," as his report made no mention of them. This lessened his credibility in her opinion, as did the fact that another relevant report—that of the Special Children's Clinic—was not prepared in time to be included in his evaluation. Also damaging to Kenney's credibility was the fact that he testified, incorrectly, that Amanda did not meet the criteria for autism. On the other hand, the HO found Amanda's mother to be a credible witness. The HO believed that she never received reports recommending psychiatric evaluation, for if she had, she would have followed up immediately. Because we must accord the credibility determinations of the HO due weight, we conclude that Amanda's parents were not given copies of the reports indicating the possibility of autism or the need for further psychiatric evaluation after requesting them. The hearing officer based her credibility determination on the live testimony of Mrs. J., Kenney, and several other people involved in the evaluation process. Hence, they deserve due weight so long as they are supported by the record. Because they are so supported, we accept the finding that Amanda's parents were not given copies of the reports indicating the possibility of autism or the need for further psychiatric evaluation after requesting them. Thus, the District was in violation of 20 U.S.C. § 1415(b)(1)(A).

We are not faced with a situation where the parents exhibited a "studied lack of cooperation with ongoing attempts to develop the ... IEP," as was the case in *Roland*. There the parents removed their child from the school district and refused to allow independent testing of the child. *Roland*, 910 F.2d at 994. On the contrary, this is a situation where the District blatantly violated one of the Act's procedural requirements, preventing full and effective parental participation, thereby "driv[ing] a stake into the very heart of the Act." *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 783 (1st Cir.1984) (holding that the Town's failure to give the parents proper notice violated the Act's procedural requirements), *aff'd Sch. Comm. of Town of Burlington v. Dept. of Educ.* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). This is a situation where the District had information in its records, which, if disclosed, would have changed the educational approach used for Amanda, increasing the amount of individualized speech therapy and possibly beginning the D.T.T. program much sooner. This is a particularly troubling violation, where, as here, the parents had no other source of information available to them. No one will ever know the extent to which this failure to act upon early detection of the possibility of autism has seriously impaired Amanda's ability to

fully develop the skills to receive education and to fully participate as a member of the community.

A FAPE, as required by the IDEA, must be tailored to the unique needs of each individual child.[12] Each child has different needs, different skills, and a different time frame for effective treatment. Autism is a developmental disorder; those affected by autism exhibit significant deficiencies in communication skills, social interaction, and motor control. Early intervention can lead to positive outcomes, particularly when children are placed in highly structured, specialized, and individualized programs. These programs often must address a wide range of skills, ranging from academic to social to functional living skills, depending on the severity of the particular child's condition.

We hold that, by failing to disclose Amanda's full records to her parents once they were requested, in violation of 20 U.S.C. § 1415(b)(1)(A), the District denied Amanda a FAPE. The IEP team could not create an IEP that addressed Amanda's special needs as an autistic child without knowing that Amanda was autistic. Even worse, Amanda's parents were not informed of the possibility that their daughter suffered from autism—a disease that benefits from early intensive intervention—despite the fact that the district's records contained test results indicating as much. Not only were Amanda's parents prevented from participating fully, effectively, and in an informed manner in the development of Amanda's IEP, they were not even aware that an independent psychiatric evaluation was recommended, an evaluation that Amanda's mother testified she would have had performed immediately. These procedural violations, which prevented Amanda's parents from learning critical medical information about their child, rendered the accomplishment of the IDEA's goals—and the achievement of a FAPE—impossible.

■ In addition to violations of the procedures set out by the IDEA, Amanda argues that § 388.387(2) of the Nevada Administrative Code was violated because neither her parents nor a speech and language specialist was present at the multidisciplinary team meeting that determined her eligibility for special education. At the time of Amanda's eligibility determinations, § 388.387(2) required that a multidisciplinary team evaluating a child for autism consist of a school psychiatrist, a special education teacher or person with specialized knowledge of autism, the child's regular teacher or someone qualified to teach her, a speech and language specialist, and at least one person with "sufficient knowledge of the pupil to interpret information relating to his social, emotional, developmental and familial condition." Nev. Admin. Code. § 388.387(2) (1994). The requirements for identifying a child as developmentally delayed, however, were different. In that case, the multidisciplinary team was required to include a special education teacher, a licensed school psy-

---

12. Congress is aware of the special educational needs of autistic children. In 1990, Congress amended the Act specifically to include children with autism as a special category under the definition of handicapped children. H. Rep. No. 101–544, at 4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 1726. It did so because it was "concerned to learn that some children, who by reason of their autism require special education and related services, continue to face difficulty in receiving a [FAPE]. By including autism in the statute, the Committee fully intends that children with autism, who by reason thereof require special education and related services, receive a [FAPE] designed to meet their unique needs." *Id.* Of course, the special needs of an autistic child cannot be addressed without the knowledge that a child is autistic.

chologist or a licensed or certified psychologist, and at least one person with "sufficient knowledge of the pupil to interpret information relating to his social, emotional, developmental and familial condition." Nev. Admin. Code § 388.430(2) (1994). A team determining the eligibility of a developmentally delayed child did not need to include a speech and language specialist.

The multidisciplinary team members attending the April 6, 1995 meeting included a psychologist, a special education teacher, and a coordinator. No speech and language specialist was included. The SRO found that the eligibility determination for a child that was developmentally delayed was "signed by the appropriate team members." Because the multidisciplinary team met the requirements for identifying a child as developmentally delayed, and because Amanda was diagnosed as developmentally delayed, the SRO's conclusion was correct.

Amanda further argues that failing to include her parents in the multidisciplinary meeting to determine her eligibility for special education violated their "right to meaningful participation." In 1994, the Nevada Administrative Code did not require that parents be included in the multidisciplinary team. See Nev. Admin. Code §§ 388.387 and 388.430 (1994). Because Amanda does not provide a specific statutory source for the right to be included in the multidisciplinary team meeting to determine Amanda's eligibility for special education, however, we do not find that this failure was a procedural violation.

### B. Educational Benefit

Because we hold that the District failed to develop the IEP in accordance with the procedures mandated by the IDEA and that this failure in and of itself denied Amanda a FAPE, we do not address the question of whether the proposed IEPs were reasonably calculated to enable Amanda to receive educational benefits. See, e.g., Target Range, 960 F.2d at 1485. Nor do we need to reach the question whether the district court erred by refusing to hear the testimony of Marshall Fenig, the District speech-language therapist who consulted in Amanda's early childhood education program.

### VI. Conclusion

For the foregoing reasons, we reverse the decision of the district court and remand. On remand, the district court is instructed to reinstate the decision of the Hearing Officer.

REVERSED and REMANDED.