**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



BUTTE SCHOOL DISTRICT NO. 1,

        Plaintiff-Appellee,

v.

C.S.; STUART MCCARVEL, in his
capacity as originator of the C.S. due
process complaint,

        Defendants-Appellants.

No.   19-35134

D.C. No. 2:14-cv-00060-SEH

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted May 11, 2020
Portland, Oregon

Before:  BYBEE and VANDYKE, Circuit Judges, and CARDONE,[**] District
Judge.

      Appellants C.S. and his care giver, Stuart McCarvel, challenge the district

court's decision reversing a hearing officer's conclusion that appellee Butte School

---

     [*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

     [**]    The Honorable Kathleen Cardone, United States District Judge for the
Western District of Texas, sitting by designation.

District No. 1 (BSD) failed to provide C.S. a free appropriate public education (FAPE) under the Individuals with Disabilities Education Improvement Act of 2007 (IDEA) during his junior year of high school, but did provide a FAPE during his senior year. The district court held that C.S. was not denied a FAPE during either school year. C.S. and McCarvel also challenge several evidentiary rulings made by the district court before and during the four-day evidentiary hearing. We have jurisdiction under 28 U.S.C. § 1291, and we affirm. Because the parties are familiar with the facts of this case, we do not lay them out here except where necessary.

"We review the district court's findings of fact for clear error even when they are based on the written record of administrative proceedings." *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). Findings of fact are "clearly erroneous when the evidence in the record supports the finding but the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). "We review de novo the question of whether" a school district provided a FAPE. *Id.*

As the main method of implementing the policy goals of the IDEA, a student's individualized education plan (IEP) "must be drafted in compliance with a detailed set of procedures." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch.*

2

*Dist. RE-1*, 137 S. Ct. 988, 994 (2017). Procedural compliance "is essential to ensuring that every eligible child receives a FAPE." *Amanda J.*, 267 F.3d at 891. Not all violations of IDEA's procedures, however, deny a student FAPE—they do so only if they "impeded the child's right to a [FAPE]; significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [FAPE] . . . ; or caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E).

1.      C.S. first contends that BSD failed to follow IDEA's procedures by not evaluating him for specific learning disabilities (SLDs), despite staff suspecting that he had SLDs in certain academic areas. *See Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1126 (9th Cir. 2016) (holding that failure to evaluate a child when required is a procedural violation that deprives the child of FAPE). But there was no clear error in the district court's holding that BSD attempted to get C.S.'s mother's approval to further evaluate and classify C.S. and C.S.'s mother resisted. While schools ordinarily "cannot eschew [their] affirmative duties under the IDEA by blaming the parents," the IDEA states that when parents do not consent to evaluations, schools do not violate the IDEA by not evaluating the student. *Doug C. v. Haw. Dep't of Educ.*, 720 F.3d 1038, 1045 (9th Cir. 2013); *see also* 20 U.S.C. § 1414(a)(1)(D)(ii). Moreover, even if the school

3

procedurally erred in not engaging in further evaluations, the record shows that C.S. received specialized services in all SLD areas during both at-issue school years, making any error harmless.

2.     C.S. next argues that BSD did not provide FAPE because it failed to adequately assess C.S.'s behaviors and develop appropriate, individualized behavioral-intervention plans.  But C.S. misreads the IDEA's requirements for students with behavioral issues by contending that BSD was required to seek out a comprehensive Functional Behavioral Assessment (FBA) performed by a licensed individual.  The IDEA only requires an FBA when a child is removed from his current placement due to problem behaviors.  20 U.S.C. § 1415(k)(1)(D)(ii).   For other students with disability-related behavioral needs, an IEP need only include (1) "measurable annual goals" developed to "enable the child to be involved in and make progress in the general education curriculum;" and (2) how "progress toward meeting the annual goals . . . will be measured."  34 C.F.R. § 300.320(a)(2)(i), (3)(i).  Our concern is whether the IEP and its underlying behavioral analysis was reasonable, not whether it was ideal, *see Endrew F.*, 137 S.Ct. at 999, and C.S. is arguing for the ideal here.  The record is replete with evidence showing that BSD staff and C.S.'s IEP team considered C.S.'s problem behaviors and took steps to correct them, including adopting behavioral-intervention plans.  And C.S.'s IEPs

4

contained measurable annual behavioral goals and specified how these goals would be measured.  No more was required of BSD, so C.S. fails to show how he was denied FAPE due to BSD's behavioral programming.

3.      C.S. next argues that BSD procedurally erred in its provision of "transition services."  For each IEP in effect after a child turns 16, the IEP must include "[a]ppropriate postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills," and "[t]he transition services . . . needed to assist the child in reaching those goals."  34 C.F.R. § 300.320(b)(1)–(2).  These services must be designed in a "results-oriented process, that is focused on improving the academic and functional achievement of the child" to enable them to move from school to post-school activities, "including postsecondary education, vocational education, integrated employment . . . , continuing and adult education, adult services, independent living, or community participation."  20 U.S.C. § 1401(34)(A); *see also* 34 C.F.R. § 300.43(a)(1).

The record is clear that BSD failed to conduct any age-appropriate transition assessments for C.S. when developing the 2011–12 school year's IEP.  Failure to do so led to C.S.'s IEP containing goals that were not specific to C.S.'s needs.  BSD therefore committed a procedural error in this year.

BSD assessed C.S. in the 2012–13 school year, and the assessment was used by his IEP team in developing measurable goals and outlining services that would help meet those goals. But C.S. contends that his IEP that year was still inadequate because additional assessments were required.

However, taking into consideration the inadequate IEP in the 2011–12 school year and assuming more assessments were required in the 2012–13 school year, the record is clear that C.S. received a host of transition services during both school years. Procedural errors only operate to deny FAPE when they deny an educational benefit, 20 U.S.C. § 1415(f)(3)(E)(ii), and the record supports the district court's finding that, even assuming an error, C.S. still benefitted from a wide variety of transition services in both at-issue school years.

4.    C.S.'s last alleged deviation from the IDEA's procedural safeguards arises out of BSD seeking to have Mary Jo Mahoney instead of McCarvel appointed as C.S.'s educational representative. When a student with a disability reaches the age of majority, "all . . . rights accorded to parents under" the IDEA transfer to the student. 20 U.S.C. § 1415(m)(1)(B). But if the student "has not been determined to be incompetent, but . . . is determined not to have the ability to provide informed consent with respect to" his or her education program, a state must "establish procedures for appointing the parent of the child, or if the parent is not available,

6

another appropriate individual" to represent the student's educational interests. *Id.* § 1415(m)(2).

C.S. was unable to provide informed consent about his educational program, so BSD was right to seek appointment of an educational representative. Because there were no established procedures in place in Montana at the time, the Office of Public Instruction (OPI) directed BSD to seek appointment of a decisionmaker using the state's surrogate-parent procedure. BSD sought—and won—appointment of Mahoney. But what OPI and BSD missed was the directive in the IDEA to attempt to appoint a parent first. Only if a parent is unavailable should "another appropriate individual" be appointed. *Id.*

When C.S. challenged Mahoney's appointment in state court, he prevailed. In a published opinion, the Montana Supreme Court held that McCarvel qualified as a parent under the applicable laws and reversed Mahoney's appointment. *See In re C.S.*, 320 P.3d 981, 985–86 (Mont. 2014). The district court took judicial notice of the opinion but held the opposite: that McCarvel had no right to appointment and so there was no procedural error in appointing Mahoney. The district court did so without a discussion of the Montana Supreme Court's opinion or the provisions of the IDEA that give foster parents the same rights as natural parents. This is

7

clear error by the district court. There was no reason not to give full faith and credit to the Montana Supreme Court's opinion.

BSD should have sought appointment of McCarvel because, as C.S.'s foster parent, he had the same rights as C.S.'s natural parents. 20 U.S.C. § 1401(23)(A). And under 20 U.S.C. § 1415(m)(2), schools should only seek appointment of someone other than a parent if the parent is unavailable. But this procedural error by BSD is harmless unless it significantly impacted McCarvel's "opportunity to participate in the IEP formulation process." *Amanda J.*, 267 F.3d at 892. And here, the record shows that McCarvel was able to meaningfully participate the same after Mahoney's appointment as he had before. Accordingly, the procedural error of not seeking McCarvel's appointment as C.S.'s representative was harmless.

5.     In addition to challenging BSD's procedures in developing and implementing his IEP, C.S. contends that the district court made multiple errors before and during the evidentiary hearing that, individually and cumulatively, merit reversal. "Evidentiary rulings are reviewed for an abuse of discretion and should not be reversed absent some prejudice." *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 927–28 (9th Cir. 2000).

First, the district court did not abuse its discretion in allowing BSD's witnesses to testify. Under the IDEA, if a party brings a civil action in the district court challenging a hearing officer's administrative ruling, the district court is not limited to the administrative record. Additional evidence may be submitted upon a party's request. 20 U.S.C. § 1415(i)(2)(C)(ii). The scope of this evidence is within the trial court's discretion, but it must not allow "additional evidence" to "change the character of the hearing from one of review to a trial de novo." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993) (citation omitted). BSD's witnesses may have testified at the administrative hearing, but their testimony before the district court was not mere repetition of that testimony. Accordingly, it was not an abuse of discretion to allow BSD to present witnesses to rebut C.S.'s new expert witnesses.

6.     Next, C.S. contends that it was an abuse of discretion for the district court to allow BSD's proposed experts to testify as expert witnesses. But any error in allowing these individuals to testify as experts despite a lack of qualifications was harmless. *See Bernal*, 204 F.3d at 927–28. The district court does not appear to have actually considered these individuals as expert witnesses or given any weight to their opinions. And given the lengthy testimony and the very few opinions

9

rendered, even if these witnesses had not been allowed to testify to opinions, they still would have been able to give substantially the same testimony.

7.     C.S. also argues that the district court abused its discretion by giving no weight to the testimony of Dr. Gentry, C.S.'s expert witness in the administrative hearing.  C.S. contends that the district court should have applied the Montana Rules of Evidence instead of the Federal Rules of Evidence, but we need not decide which rules apply because they do not differ on the question that was dispositive to the district court—whether Dr. Gentry was qualified to testify as an expert.  The Montana Supreme Court has rejected the federal standard for assessing the reliability of the reasoning and methodology underlying a proposed expert's opinion, not the generally accepted standards for assessing a proposed expert's qualifications.  *See Hulse v. State*, 961 P.2d 75, 89–91 (Mont. 1998).  Montana's rules still require a proposed expert to "be qualified as an expert to give an opinion in the particular area of the testimony."  *Id.* at 89 (citation omitted).  The district court's decision here came down to doubts about Dr. Gentry's qualifications, not his methods, so the difference between the state and federal rules is immaterial.

It was not an abuse of discretion to sustain BSD's objection to Dr. Gentry's designation as an expert.  While Dr. Gentry is well educated, the record supports

the district court's findings that he lacked certain qualifications important to his ability to give opinions on whether C.S.'s IEPs were adequate. But regardless, C.S. was not prejudiced because he was able to present extensive testimony from two experts that covered substantially similar information.

8.    C.S. also argues that the district court abused its discretion in refusing to admit two exhibits for impeachment purposes. But any error related to these documents was harmless. Exhibit 9 was eventually admitted as non-hearsay and C.S. appeared to have gotten the answer that Exhibit 20-B was designed to induce from the witness without the document being admitted. Accordingly, the failure to admit these documents was not reversible error.

9.    Finally, C.S. argues that the neuropsychological evaluation reports created by one of his experts should have been admitted. Setting aside the admissibility of the documents, C.S. was able to fully question this expert at the hearing about the information contained in the reports, including tests performed, diagnostic conclusions, and the impact of C.S.'s conditions on his education. Because the pertinent medical information contained in the reports became part of the record via the expert witness's testimony, there was no prejudice to the reports not being admitted.

    AFFIRMED.