**M.L., a minor; C.D. and S.L., his parents, Petitioners–Appellants,**

v.

**FEDERAL WAY SCHOOL DISTRICT; Washington Superintendent of Public Instruction, Respondents–Appellees.**

No. 02–35547.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2003.

Filed Sept. 2, 2003.

James E. Lobsenz, Carney Badley Spellman, P.S., Seattle, WA, for the petitioners-appellants.

Christopher L. Hirst, Preston Gates & Ellis LLP, Seattle, WA; James J. Dionne, Dionne & Rorick, Seattle, WA, for the respondents-appellees.

Before: ALARCÓN, GOULD, and CLIFTON, Circuit Judges.

ALARCÓN, Senior Circuit Judge.

M.L. and C.D., his mother, and S.L., his father, appeal from the order granting the motion for summary judgment filed by Appellees, Federal Way School District and the Washington Superintendent of Public Instruction. We affirm because we conclude that Appellants have failed to

demonstrate that M.L. was denied a free appropriate public education ("FAPE").

I

Unless otherwise indicated, the facts are undisputed. M.L. was born on November 13, 1994. He suffers from autism, mental retardation and macrocephaly.[1] As of February 2001, he was globally delayed across all developmental domains consistent with his cognitive level and had significant behavioral problems. M.L. was almost completely nonverbal, had virtually no communication skills, was not toilet-trained, and had a cognitive ability that placed him at the first percentile level on the Battelle Developmental Inventory.[2] M.L. had not learned to generalize many skills. Dr. Ilene Schwartz, one of the Federal Way School District's experts regarding educational practices for children with autism, indicated that M.L. might be able to perform tasks with a familiar service provider, but would be unable to demonstrate those skills when asked to do so in another environment. M.L. made gains in physical therapy between 1997 and 2000. The progress reports from Puget Sound Therapy Services indicate, however, that as of August 2000, M.L. had frequent temper tantrums and displayed aggressive behavior such as hitting and pinching, which interfered with his performance in therapy. M.L.'s occupational therapist recommended that M.L. would benefit from a more structured environment.

M.L. was enrolled in a preschool program in the Tukwila School District in September of 1997. He attended preschool four days per week for approximately two hours per day for three years. Except for a few months in his third year, M.L. was continuously assigned to Jodie Wicks's integrated preschool class through June of 2000.[3] The class followed the same routine each day, using the same songs and activities. Each year the class also included several of the same students and the same instructional assistants.

M.L.'s skills improved over the course of his three years in Ms. Wicks's class. M.L. began to interact more frequently with other children and participated, to a limited extent, in classroom activities. M.L. was teased a few times while enrolled there. During the three years he was enrolled in Ms. Wicks's class, he was assigned a one-on-one instructional assistant who remained with him throughout the day. M.L. displayed increasingly aggressive behavior during that time. This conduct was documented by many of his service providers. His level of aggression escalated when he was frustrated or given more challenging tasks. He would cry and whine or bite and scratch his instructional assistant. He mouthed many objects and at least on one occasion bit another child. Lai Doo, M.L.'s in-home therapist, testified that as M.L.'s level of communication increased, his level of aggression decreased. However, Ms. Doo also stated that M.L.'s "level of aggression seem[ed] to be a lot more severe than the others that [she had] seen."

Because M.L. is disabled, the Tukwila School District was required by 20 U.S.C.

1. Macrocephaly is a condition that causes the measurement of the distance around the widest part of the skull to be larger than expected for the age and background of the child.

2. The Battelle Developmental Inventory Screening Test is administered to children six months to eight years old and includes subtests which measure fine and gross motor, adaptive, personal-social, receptive and expressive language, and cognitive skills.

3. An "integrated" or "regular" classroom consists of both typically developing children and a small number of disabled children. They are taught by a "regular education" teacher.

§ 1414(d)(1)(A), to create an individualized education program ("IEP") each year that stated M.L.'s "present levels of educational performance," outlined the "special education and related services ... to be provided to [M.L.]," and set forth "measurable annual goals." The composition of the "IEP team," the group of people who are required to participate in the creation of the IEP, is dictated by 20 U.S.C. § 1414(d)(1)(B). On January 31, 2000, the IEP team for the Tukwila School District, which included Ms. Wicks, prepared an IEP for M.L.'s initial placement for the 2000–2001 academic year. Under the Tukwila School District IEP, M.L. was to be enrolled in September in an integrated kindergarten class for 130 minutes, four times per week and was to receive additional therapy and instructional services.

Around July 30, 2000, M.L. and his family moved to the Federal Way School District, prior to M.L.'s enrollment in kindergarten in the Tukwila School District. M.L. began kindergarten on September 5, 2000, at the Mark Twain Elementary School in the Federal Way School District. The Federal Way School District attempted to implement the Tukwila School District's IEP until it was due to expire on September 30, 2000. Accordingly, M.L. was placed in Sandy Ramsey's integrated kindergarten class. Ms. Ramsey is duly certified as a regular and special education teacher.

At C.D.'s suggestion, Ms. Ramsey controlled M.L.'s behavior in class by letting him listen to his favorite music on his headphones. The Federal Way School District hired a series of one-on-one instructional assistants to work with M.L. Each of them quit after working with him for one day.

During the majority of the five days M.L. was enrolled at the Mark Twain School, C.D. attended class with M.L. On September 5, 2000, C.D. witnessed two boys teasing M.L. She discussed this incident with Ms. Ramsey and Pat Warden, Ms. Ramsey's classroom assistant. Ms. Ramsey responded that she "would make a note and make it a priority to keep observing—keep an eye on these children and a better eye on [M.L.] to see if anything continued to happen so she could address any incidents that might happen." On September 6, 2000, C.D. observed more children teasing M.L. at recess. She reported this conduct to Ms. Ramsey and Ms. Warden. C.D. testified, however, that M.L. was "happy as a little lark" during recess.

On September 7, 2000, C.D. again observed children teasing M.L. at recess and during class time. She discussed this conduct with Ms. Ramsey. Ms. Ramsey told C.D. that she "had not witnessed any teasing of M.L. during class, but would continue to watch for it and intervene if necessary." Ms. Ramsey informed C.D. that "policies were in place regarding teasing and that she did not allow such behavior in her class."

C.D. witnessed additional teasing incidents on September 8 and September 11, 2000. She reported these events to Ms. Ramsey. Ms. Ramsey replied that "she would keep an eye on [M.L.] and would take care of it." Ms. Ramsey did not take any action regarding the teasing incidents. C.D. testified that there was no evidence that M.L. was actually affected by the teasing and that "because he had his headphones on most of the time he was being teased ... [she] didn't know if he even heard it."

The morning of September 12, 2000, C.D. called Diane Conn, the Vice–Principal of the Mark Twain School, to report a teasing incident that had allegedly occurred the previous day. Ms. Conn suggested that C.D. contact Ms. Ramsey.

Ms. Conn then contacted Ms. Ramsey and advised her to talk to C.D.

On September 13, 2000, Ms. Ramsey telephoned C.D. to discuss her complaint that M.L. had been teased on September 11, 2000. Ms. Ramsey informed C.D. that the teasing that took place on September 11, 2000 was the only incident that she had observed. Ms. Ramsey testified that during that conversation, she requested that C.D. give her the first opportunity to take care of problems concerning M.L. before C.D. took the matter further. M.L. did not return to the Mark Twain School after September 11, 2000. C.D. did not speak with any Federal Way School District administrator before removing her child from the school.

On or about September 17, 2000, the Federal Way School District offered to place M.L. at the Wildwood Elementary School in a self-contained classroom[4] taught by Teresa Thomas, a certified special education teacher with experience in teaching autistic children. C.D. refused to enroll M.L. in the Wildwood Elementary School because she believed that the self-contained class did not provide for sufficient participation with regular education students. She thought that "it could be potentially dangerous for [M.L.]" to interact with the other students in the self-contained class. C.D. did not visit Ms. Thomas's class at any time.

After M.L.'s Tukwila School District IEP expired on September 30, 2000, a multidisciplinary team ("MDT"), which included C.D., met on October 6, 2000, to determine whether M.L. qualified for special education services. The evaluation was based upon extensive records from M.L.'s care-providers, identified by C.D.; the discussions between Jan Rutledge, a Federal Way School District Psychologist, and both Ms. Wicks and the school psychologist at the Tukwila School District; the Tukwila School District IEP; an interview with C.D.; and a two-hour observation of M.L. by the MDT.

After evaluating M.L., the MDT drafted a Special Education Evaluation Report which contained recommendations for M.L.'s education. The MDT recommended that M.L. be placed in a special education program that offered a small class size, provided visual supports, and predictable and consistent schedules and routines. The MDT, including C.D. and M.L., met again on October 13, 2000, to discuss the results of the evaluation and the MDT's recommendations.

On or about, October 25, 2000, Dr. Drinkwater again offered to place M.L. at the Wildwood Elementary School, Mark Twain Elementary School, or several other schools within the Federal Way School District, pending completion of a new IEP. C.D. refused each of these suggestions. On October 27, 2000, M.L.'s parents requested that the Federal Way School District provide an independent evaluation of M.L. In response, the District filed a request for a due process hearing on November 9, 2000.

On November 1, 2000, Dr. Lee Saffrey, a district program specialist, mailed M.L.'s parents a letter proposing an IEP meeting for November 13, 2000, at 8 a.m. C.D. faxed a letter to Dr. Saffrey on November 1, 2000, in which she stated that she would not attend any IEP meetings unless "the staff from [her] child's neighborhood school (Starlake Elementary)" was present and only if the meetings were held at the Federal Way School District administration offices or the Starlake Elementary School. C.D. also indicated that she would not be available on November 13th until after 6:00 p.m. On November 2, 2000, the

4. A "self-contained" classroom consists of only disabled students.

Federal Way School District notified C.D. that it changed the location of the meeting to its administrative offices and that the meeting would occur at 4:00 p.m. on November 13, 2000.

On November 6, 2000, C.D. faxed a letter to the Federal Way School District regarding her availability for the IEP meeting. Although C.D. did not work outside the home and was the parent primarily involved in monitoring M.L.'s education, including attending school with him for his first five days at the Mark Twain Elementary School, C.D. asserted that she would not be able to attend the IEP meeting at 4:00 p.m. She instead proposed times for the meeting that were clearly not within the District's regular hours such as between 4:15 *a.m.* and 5:15 *a.m.* from Monday through Friday, or on the weekends. The Federal Way School District conducted such meetings between 7:00 a.m. and 4:00 p.m., Monday through Friday. The Federal Way School District responded that M.L.'s parents could participate via a conference call. C.D. replied that she would not be able to participate in a conference call at any time on November 13, 2000.

The Administrative Law Judge ("ALJ") found that the assertion that M.L.'s parents could not attend the IEP meeting at 4:00 p.m. was not credible. S.L.'s timesheet records from his employer indicate that on November 13, 2000 his workday ended at 2:58 p.m., allowing him sufficient time to attend a meeting at 4:00 p.m. C.D. claimed that she had to bring M.L. to an appointment at that time, however, a fax was sent from C.D.'s home at 5:05 p.m. bearing C.D.'s handwriting. The fax journal was printed at 5:10 p.m.

The Federal Way School District's IEP meeting was held on November 13, 2000,

at 4:00 p.m. M.L.'s parents did not attend. A letter written by Ms. Wicks on May 10, 2000 was considered by the IEP team. In her letter, Ms. Wicks recommended that M.L. remain in a general education classroom during his kindergarten year. Although Ms. Thomas was present at the IEP meeting, a regular education teacher did not attend.

After reviewing M.L.'s previous IEP and records, the Federal Way School District's IEP team concluded that M.L. "would do better in a smaller setting with the opportunity to work on specific skill areas" and recommended placement in Ms. Thomas's self-contained classroom at the Wildwood Elementary School. The IEP provided for mainstreaming opportunities[5] during lunch, recess, assemblies, music, library, and school activities. The Wildwood program incorporated specialized strategies for teaching autistic children and was taught by a teacher and assistants who had special training in teaching autistic children. The self-contained classroom was smaller than an integrated kindergarten and was specially designed for students ranging from kindergarten through sixth grade.

The Federal Way School District mailed M.L.'s parents a copy of the IEP on November 17, 2000. Dr. Drinkwater also enclosed a letter offering M.L.'s parents the opportunity to discuss and refine further the IEP prepared on November 13, 2000. M.L.'s parents did not respond.

In February 2001, an eight-day due process hearing was held before an ALJ pursuant to the Individuals With Disabilities Education Act ("IDEA"). M.L.'s parents contended that the Federal Way School District had violated the Act by, *inter alia,* providing an inadequate evaluation of M.L.

**5.** "Mainstreaming" is a term used to describe opportunities for disabled students to engage in activities with non-disabled students.

and failing to provide M.L.'s parents an opportunity to meaningfully participate in the development of the IEP. The ALJ determined that the Federal Way School District had not violated the IDEA and denied Parents' motion for reconsideration.

Pursuant to 20 U.S.C. § 1415(i), Parents timely appealed the ALJ's final decision to the United States District Court for the Western District of Washington. In their complaint, they asserted that the Federal Way School District had engaged in procedural and substantive violations of the IDEA. In a motion for partial summary judgment, M.L.'s parents asked the district court to set aside the IEP adopted by the Federal Way School District on November 13, 2000; direct the Federal Way School District to assemble a new IEP team that properly follows the procedural requirements of the IDEA; "direct the District to continue to place M.L. in a regular education classroom;" and "direct the District to implement procedures that would ensure detection and prevention of teasing of M.L. by his classmates." M.L.'s parents also sought damages, including reimbursement of education costs for M.L., and attorneys fees for the Federal Way School District's alleged failure to provide M.L. a FAPE.

The district court granted the Federal Way School District's motion for summary judgment, holding that the Federal Way School District "did not significantly deviate from the IDEA's required procedures in formulating M.L.'s IEP" and that the Federal Way School District did not deny M.L. a FAPE.

## II

The Federal Way School District filed a motion with this court on December 24, 2002, asking to correct the incomplete certified transcript, which omitted the testimony of Dianne Conn. In their supplemental letter brief, M.L.'s parents argue that normally the reviewing court will not supplement the record with material not considered by the trial court. We have previously held, however, that "[i]n reviewing the record, this court must examine the administrative record as *a whole* ...." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir.1990) (emphasis added). *See also* 20 U.S.C. § 1415(i)(2)(B)(1) (stating that in reaching its decision, a reviewing court is required to "receive the records of the [state] administrative proceedings"). In addition, Rule 10(e) of the Federal Rules of Appellate Procedure allows the record to be corrected if "anything material to either party is omitted from or misstated in the record by error or accident[.]" Ms. Conn's testimony was erroneously omitted from the record considered by the district court. Since our review of the district court's determination regarding the appropriateness of a special education placement is de novo and we are required to consider the entire administrative record, we granted the district's motion to complete the certified record.

## III

In a judicial proceeding under the IDEA, a reviewing court is required to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) [hereinafter *Rowley* ]. The appropriateness of a special education placement under the IDEA is reviewed de novo. *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir.1992) [hereinafter *Target Range* ]. Where, as here, the district court relies on a written record of administrative proceedings, the clearly erroneous standard applies to the district court's findings of fact. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir.1987). Here, where the dis-

trict court did not receive any additional evidence or testimony, we stand in the same shoes as the district court in reviewing the administrative record and may, therefore, accept the conclusions of the ALJ and district court that are supported by the record and reject those that are not. *Cf. M.M. ex rel. D.M. v. Sch. Dist. of Greenville County,* 303 F.3d 523, 531 (4th Cir.2002) ("[W]e need not defer to factual recitations made by a district court from the administrative record, because that court stands in no better position than do we in reviewing the record."); *Great W. Bank v. Office of Thrift Supervision,* 916 F.2d 1421, 1426 (9th Cir.1990) (" 'District court review of agency action is generally accorded no particular deference, because the district court, limited to the administrative record, is in no better position to review the agency than the court of appeals.' ") (quoting *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1161 (9th Cir.1980)). As the losing parties before the district court, M.L.'s parents bear the burden of demonstrating that the Federal Way School District did not comply with the IDEA. *Clyde K. v. Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994). The district court had jurisdiction over this matter pursuant to 20 U.S.C. § 1415(i)(2)(A). We have appellate jurisdiction under 28 U.S.C. § 1291.

### IV

■■■■ The IDEA and its implementing regulations provide federal money to assist state and local agencies in educating children with disabilities. *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1469 (9th Cir.1993). One of the primary purposes of the IDEA is to "ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs[.]" 20 U.S.C.

§ 1400(d)(1)(A) (2003). This goal is "achieved through the development of an ... IEP for each child with a disability." *Ojai,* 4 F.3d at 1469. To ensure that a child receives a FAPE in accordance with the IDEA, a state must comply both procedurally and substantively with the IDEA. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. "State standards that are not inconsistent with federal standards are also enforceable in federal court." *Target Range,* 960 F.2d at 1483.

■■■■ We must first determine whether the Federal Way School District has met the "rigorous procedural requirements of the IDEA...." *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir.1994). "Not every procedural violation [ ] is sufficient to support a finding that the child in question was denied a FAPE." *Amanda J. v. Clark County Sch. Dist.,* 267 F.3d 877, 892 (9th Cir.2001). "However, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Target Range,* 960 F.2d at 1484 (internal citations omitted). If this court determines that the Federal Way School District did not substantially violate the procedural requirements of the IDEA, the court must then decide whether the IEP developed by the Federal Way School District meets the Act's substantive requirement, that the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034.

The IDEA specifies the individuals who are required to be present during the development of a disabled child's IEP. Before 1997, the school district was obligated to include the child's current teacher as a member of the IEP team. 20 U.S.C. § 1401(a)(20) (1996).[6] *See also Shapiro ex*

---

**6.** 20 U.S.C. § 1401(a)(20) (1996) reads in per- tinent part: "The term 'individualized edu-

*rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69,* 317 F.3d 1072, 1076–77 (9th Cir.2003) (holding that 20 U.S.C. § 1401(a)(20) requires that the disabled child's current teacher must be included on the IEP team). In 1997, Congress revised the statute to require the inclusion of "at least one regular education teacher of such child (if the child is, *or may be,* participating in the regular education environment)" and "at least one special education teacher, or where appropriate, at least one special education provider of such child." 20 U.S.C. § 1414(d)(1)(B) (2003) (emphasis added).

M.L.'s parents assert that the Federal Way School District violated procedural requirements of the IDEA by failing to include a regular education teacher and someone with first-hand knowledge of M.L. on the IEP team and by deciding to place M.L. in a self-contained classroom before the IEP meeting. The Federal Way School District contends that it did not violate the procedures of the IDEA because there was a regular education teacher on the IEP team. This teacher did not participate in any of the IEP team meetings. In the alternative, the Federal Way School District asserts that any procedural violations did not result in a loss of an educational opportunity for M.L.

## A.

■ M.L.'s parents concede that M.L. was not enrolled in a regular classroom at the time of the IEP meeting and thus had no current regular education teacher. They point out, however, that the statute does not require that a child be currently enrolled in a regular classroom at the time of the meeting. Section 1414(d)(1)(B) requires the participation of a regular education teacher on the IEP team if the child "may be" participating in a regular education classroom. M.L.'s parents interpret the meaning of the term "may be" to mean a "possibility" that M.L. would be placed in a regular education environment. M.L.'s parents conclude that this possibility existed since the Tukwila School District's IEP had recommended that M.L. be placed in a regular education kindergarten classroom.[7]

In its answering brief, the Federal Way School District has attempted to rebut M.L.'s parents' interpretation of the statute. However, in presenting its arguments, the Federal Way School District has ignored the plain meaning of the statute. Webster's Dictionary defines "may" as to "be in some degree likely." Webster's Third New International Dictionary 1396 (4th ed.1976). The record shows that the IEP developed by the Tukwila School District for M.L. required placing him in a regular kindergarten classroom; M.L. had attended a regular preschool classroom for three years; after his family moved to the Federal Way School District, M.L. was placed in Ms. Ramsey's regular classroom; and M.L.'s parents had rejected placement

---

cation program' means a written statement for each child with a disability developed in any meeting by . . . the teacher[.]"

**7.** The district court relied on *Clyde K.,* 35 F.3d at 1400, to reach its holding that since "[i]n the case of a student who is new to the district, it is permissible to include only teachers who are likely to be entrusted with him in the new placement." In 1994, when *Clyde K.* was decided, a school district was only required to include the child's teacher on the IEP team. The Act was revised in 1997 by Congress to require the presence of both a regular and special education teacher at the IEP meeting. Therefore, the holding of *Clyde K.* is inapposite to this matter. Similarly, our recent decisions in *Ms. S. v. Vashon Island Sch. Dist.,* 337 F.3d 1115 (9th Cir.2003) and *Shapiro,* 317 F.3d 1072, do not affect this action since both decisions relied on the pre-1997 version of the IDEA to reach their holdings that the presence of the student's "current teacher" is required at the IEP meeting.

in a self-contained classroom at the Wildwood Elementary School and expressed a strong preference for mainstreaming. In light of these facts, the record supports the inference that it was in "some degree likely" that M.L. would be placed in a regular education classroom.

▮▮ Congress revised the IDEA specifically to emphasize the role a regular education teacher performs on the IEP team. This requirement is therefore not merely technical, but serves an important function in providing a FAPE for a disabled child. The fact that the name of a regular education teacher, who did not participate in the IEP meeting, was included on a list of IEP team members is not sufficient to fulfill the central role that regular education teachers can play in educating children with disabilities. We are persuaded that the Federal Way School District's failure to include a regular education teacher on the IEP team was a procedural violation of the IDEA. "Procedural flaws do not automatically require a finding of a denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity or seriously infringe the parents' opportunity to participate in the IEP formulation process clearly result in the denial of a FAPE." *Target Range*, 960 F.2d at 1484 (internal citations omitted).[8]

▮▮ M.L.'s parents assert that M.L.'s lost educational opportunity was the district's failure to include him in a regular education classroom. This contention is true only if M.L.'s enrollment in the self-contained classroom would result in a denial of a FAPE or if the IEP meeting's outcome would have been different had a regular education teacher, or someone with firsthand knowledge of M.L. been present at the meeting. *See, e.g., Shapiro,* 317 F.3d at 1079 ("The [school district's] failure to include the persons most knowledgeable about [the student's] educational levels and needs ... at the June 8 IEP meeting and its concomitant creation of a defective IEP resulted in lost educational opportunity for [the student]."); *M.M.,* 303 F.3d at 534 ("If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations."); *Heather S. v. Wisconsin,* 125 F.3d 1045, 1059–60 (7th Cir.1997) (holding that since the District had not denied the student a FAPE, that the procedural violation could not have resulted in a loss of educational opportunity).

M.L.'s parents fault the IEP for having "no opportunity for integration or mainstreaming with non-disabled children." This description mischaracterizes the IEP. In fact, the IEP provided for seventy-five minutes of participation in the general education environment per week including "lunch time, recess, assemblies, music, library, and school activities," and could be revised and adapted in accordance with M.L.'s needs.

M.L.'s parents also assert that M.L. should have been in a regular education

---

8. M.L.'s parents do not assert that the procedural violation "seriously infringe[d]" on their ability to participate in the process of developing the IEP. The Federal Way School District was authorized to go forward with an IEP meeting without the child's parent when it was unable to convince them to attend. 34 C.F.R. § 300.345 (authorizing a school district to proceed with an IEP meeting without the presence of a child's parent if the school district is unable to convince the parents to attend following attempts of record to do so). The Federal Way School District made extensive attempts to include parents in the meeting, to no avail. In this appeal, M.L.'s parents do not contest the ALJ's finding that M.L.'s parents' reasons for missing the meeting were not credible. Therefore, the Federal Way School District's decision to hold the IEP meeting without M.L.'s parents did not deny M.L. a FAPE.

kindergarten classroom because he had made significant progress while in Ms. Wicks's preschool class in the Tukwila School District and Ms. Wicks had recommended that M.L. continue to be mainstreamed. There is ample evidence in the record, however, that the Federal Way School District's IEP team's decision to place M.L. in the Wildwood program was indeed the best placement for him. In addition, the record supports the conclusion that had either Ms. Ramsey or Ms. Wicks been present at the meeting, the IEP team would have reached the same conclusion regarding M.L.'s placement. In an e-mail to Dr. Drinkwater, dated September 5, 2000, Ms. Ramsey wrote:

> I have never had such a low functioning student in all my 11 years in Spec. ed ... even when I was teaching the Down's Syndrome classes. What is the process the MDT needs to go through to determine his best placement. I know mom wants him to be treated like any "K" student, but on the other hand, she wants everything I do, changed, (to be more like a self-contained preschool setting). I'm really puzzled by this student, and how to best help his many needs.

Furthermore, although Ms. Wicks testified at the due process hearing that she thought it was critical for M.L. to be placed in an integrated kindergarten, she admitted that she did not expect M.L. to achieve much academic success in a mainstream placement. Substantial evidence in the record supports the conclusion that the District's procedural violation did not result in a loss of an educational opportunity for M.L. The Federal Way School District's failure to include a regular education teacher on the IEP team did not deny M.L. a FAPE.

### B.

M.L.'s parents further contend that the Federal Way School District violated the procedures of the IDEA by failing to "include anyone who had ever taught or cared for M.L." on the IEP team. The requirement that one with knowledge of the child be included on the IEP team is aimed at enabling meaningful parent involvement in the IEP development process. *See, e.g., Rowley,* 458 U.S. at 205, 102 S.Ct. 3034 (describing the substantial emphasis placed by Congress "upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process"); *Amanda J.,* 267 F.3d at 891–92 (9th Cir.2001) ("The critical nature of the provisions protecting parental involvement is highlighted when they are considered in light of the stated purposes of the IDEA. To accomplish the IDEA's goal of ensuring that[all children with disabilities receive a FAPE] ..., those individuals who have first-hand knowledge of the child's needs ... must be involved in the IEP creation process. The procedural safeguards facilitate this objective [and] .... ensure that the rights of children with disabilities and their parents or guardians are protected.") (quotation marks and citations omitted); *Doe ex rel. Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir.1990) ("Adequate parental involvement and participation in formulating an IEP, not adherence to [a] laundry list of items ..., appear to be the Court's primary concern in requiring that procedures be strictly followed."). The statute requires that "other individuals who have knowledge or special expertise regarding the child" should be included on the IEP team "at the discretion of the parent or the agency[.]" 20 U.S.C. § 1414(d)(1)(B)(vi). *See also* 34 C.F.R. § 300.552(a)(1) (requiring the placement decision regarding a child with a disability to be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation

data, and the placement options"). The Federal Way School District went to great lengths to include M.L.'s parents in the IEP meeting. M.L.'s parents refused to attend the 4:00 p.m. meeting scheduled by the Federal Way School District. Instead, C.D. insisted that the meeting be scheduled at times such as 4:15 a.m. or on the weekend. The record shows that M.L.'s parents could have attended the meeting at 4:00 p.m. M.L.'s parents have not cited to any authority that requires the Federal Way School District to track down someone with firsthand knowledge of M.L. to attend the IEP meeting when M.L.'s parents were available but refused to attend. *Cf. Roland M. v. The Concord Sch. Comm.,* 910 F.2d 983, 995 (1st Cir.1990) (holding that when the student's parents had a relationship with the student's teacher who they failed to invite to their IEP meeting "[t]he law ought not to abet parties who block assembly of the required team and then, dissatisfied with the ensuing IEP, attempt to jettison it because of problems created by their own obstructionism"). The Federal Way School District's failure to include someone with firsthand knowledge of M.L. on the IEP team was not a procedural violation of the IDEA.

### C.

 M.L.'s parents further assert that the Federal Way School District violated the principle that a school district may not make a placement decision first and then devise an IEP afterwards. The Federal Way School District acknowledges that school officials must come to the IEP table with an open mind. However, the Federal Way School District, relying on *Doyle v. Arlington County Sch. Bd.,* 806 F.Supp. 1253 (E.D.Va.1992), *aff'd,* 39 F.3d 1176 (4th Cir.1994), contends that "this does not mean that they should come to the IEP table with a blank mind .... [but] can,

and should, have given some thought to that placement." *Id.* at 1262. We agree.

The Fourth Circuit held in *Spielberg ex rel. Spielberg v. Henrico County Pub. Schs.,* 853 F.2d 256, 259 (4th Cir.1988) that a school district may not determine a placement for the student before the IEP meeting. This holding was premised on the "spirit and intent of the [IDEA], which emphasizes parental involvement." *Id.* at 259. Here, the Federal Way School District made every effort to include M.L.'s parents in the IEP meeting. Under Washington law, the Federal Way School District is required to develop an evaluation report which must include, among other elements, "the recommended special education and related services needed by the student including specially designed instruction." Wash. Admin. Code. § 392–172–10905 (2003). In addition, in accordance with Washington Administrative Code § 392–172–302, the Federal Way School District notified M.L.'s parents that it intended to implement the Student's IEP at Wildwood. M.L.'s parents do not contend that Washington law violates the IDEA. Therefore, the fact that the Federal Way School District included special education teachers from M.L.'s potential future school on the IEP team is not evidence that the Federal Way School District predetermined M.L.'s placement and was not a procedural violation of the IDEA.

### V

 At the due process hearing Dr. Drinkwater testified that "[t]he District's vision is that all students will read. That's the expectation...." M.L.'s Parents contend that this statement is evidence that the Federal Way School District decided to exclude M.L. from a regular education classroom based on its knowledge that M.L. would not learn to read by the end of

kindergarten. M.L.'s parents contend that this alleged policy violated the IDEA's requirement that the agency conducting the evaluation of the disabled child "shall ... not use any single procedure as the sole criterion for ... determining an appropriate educational program for the child[.]" 20 U.S.C. § 1414(b)(2).

The Federal Way School District asserts that it does not have a policy that it only accepts students into kindergarten who will be able to read by the end of the year, and no such policy was used to determine M.L.'s placement. The Federal Way School District claims that Dr. Drinkwater's statement was merely evidence that the school district has articulated academic expectations for its students, which it is allowed to do under the Act. *See Roland M.*, 910 F.2d at 992 (noting that "[a]cademic standards are matters peculiarly within the expertise of ... local educational authorities").

Dr. Drinkwater testified that:

A: If you are asking if the district has a policy about not entering kindergarten students, they don't. Anyone who is of age, of kindergarten age, can be enrolled in the district.... [A] child who is five years old by August 31st of that school year can enter as a kindergarten student.

Q: ... [E]ven though we don't expect that child to be meeting the reading levels or reading goals that we have for the class in general, it still is appropriate to put him in that class; is that right?

A: You asked me if they were allowed to get into kindergarten, and I said the district has a five year policy. The District doesn't have a policy about which particular kindergarten a student could or couldn't get into, not policy.

M.L.'s parents claim that Dr. Drinkwater's testimony that "anyone who is of age ... can be enrolled in the district" does not mean, as implied by the district court, that anyone of kindergarten age could enroll in a regular education classroom, but merely that one could enroll in the Federal Way School District. M.L.'s parents' interpretation of Dr. Drinkwater's testimony strains credulity. Dr. Drinkwater specifically stated that the district had "*no policy*" regarding "which particular kindergarten a student could or couldn't get into." (emphasis added). M.L.'s parents have offered no evidence to support their contention that an inflexible reading policy prevented the Federal Way School District from enrolling M.L. in a regular classroom. Therefore, M.L.'s parents have failed to demonstrate that the Federal Way School District determined M.L.'s placement based on a rigid policy or criteria.

## VI

M.L.'s parents contend that by including M.L. in a self-contained classroom, the Federal Way School District failed to place him in the least restrictive environment as required by the Act. The IDEA "requires participating States to educate handicapped children with non-handicapped children whenever possible." *Rowley*, 458 U.S. at 202, 102 S.Ct. 3034. However, "[t]he IDEA's preference for mainstreaming is not an absolute commandment." *Poolaw v. Bishop*, 67 F.3d 830, 836 (9th Cir.1995). "In some cases, such as where the child's handicap is particularly severe, it will be impossible to provide any meaningful education to the student in a mainstream environment. In these situations continued mainstreaming would be inappropriate and educators may recommend placing the child in a special education environment." *Id.* at 834.

■ We have adopted a four-factor balancing test to determine whether a school district has complied with the IDEA's mainstreaming requirement.[9] The court must consider "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [the student]." *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. ex rel. Holland,* 14 F.3d 1398, 1404 (9th Cir.1994) [hereinafter *Rachel H.*].[10]

### A.

M.L.'s parents assert that the district court and ALJ erred by analyzing "educational benefit" narrowly in terms of academic achievements. However, this court has analyzed the first *Rachel H.* factor specifically by evaluating the *academic* benefits to the child of mainstreaming. *See Clyde K.,* 35 F.3d at 1401 (stating that when the court applies the four *Rachel H.* factors, it looks first to "the academic benefits of placement in a mainstream setting, with any supplementary aides and services that might be appropriate"). *See also Rowley,* 458 U.S. at 207 n. 28, 102 S.Ct. 3034 (observing that "achievement of passing marks and advancement from grade to grade" is an "important factor in determining educational benefit"); *Beth B. v. Van Clay,* 282 F.3d 493, 499 (7th Cir.2002) (explaining that the fact that the student's "academic progress was virtually non-existent" weighed against mainstreaming).

M.L.'s parents maintain that a segregated classroom enjoys no educational advantage over a regular classroom for M.L. This contention is not supported by the record. M.L.'s parents have not adduced any evidence that there would be an educational benefit in placing M.L. in a regular classroom. To the contrary, the record supports the conclusion that M.L. would receive significant academic benefits from the Wildwood program. M.L. has virtually no communication skills and has a cognitive ability that places him at the first percentile level on the Battelle Developmental Inventory. The Federal Way School District presented testimony from two experts that the Wildwood program would help M.L. learn generalization and communication skills that he would not learn if mainstreamed. In addition, Ms. Wicks admitted that she did not expect M.L. to achieve much academic success in a mainstream placement. The district court pointed out that "The District's experts at the due process hearing uniformly identified the special education placement at Wildwood Elementary as the superior option, and Petitioners offered no expert testimony in rebuttal." Accordingly, the first *Rachel H.* factor weighs against placing M.L. in a regular education classroom.

**9.** The mainstreaming provision of the IDEA requires a disabled child to be placed in the "[l]east restrictive environment" and that:

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A) (2003).

**10.** The parties agree that the cost of placing M.L. in a regular education classroom is not significantly different from the cost of the Wildwood special education placement. Therefore, we need only balance the first three factors to determine whether the Federal Way School District complied with the mainstreaming requirements of the IDEA.

## B.

M.L.'s parents contend that in both types of classrooms, M.L. would work with a one-on-one aide at all times, leading to equally limited contact with other students. Thus, M.L.'s parents conclude that where the non-academic benefit to M.L. is the same in each program, the preference for mainstreaming must control. M.L.'s parents also assert that M.L. would derive significant non-academic benefits from his ability to interact with other children of the same age in a regular education classroom, in contrast to the self-contained classroom at Wildwood Elementary School, which had only one other kindergarten student at the time M.L. was to be enrolled. The Federal Way School District argues that, weighed against the other *Rachel H.* factors, the opportunity for exposure to non-handicapped children alone is not sufficient to constitute substantial non-academic benefits that justify mainstreaming a child.

School districts must balance the IDEA's preference for mainstreaming disabled children with the Act's requirement that all students receive a FAPE that is tailored to each child's unique needs. *Compare* 20 U.S.C. § 1412(a)(5) *with id.* § 1412(a)(1). Although a disabled child may receive a very limited educational benefit from a regular education program, he or she "may benefit enormously from the language models that his nonhandicapped peers provide for him. In such a case, the benefit that the child receives from mainstreaming may tip the balance in favor of mainstreaming, even if the child cannot flourish academically." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1049 (5th Cir.1989). However, "[i]n some cases, such as where the child's handicap is particularly severe, it will be impossible to provide any meaningful education to the student in a mainstream environment." *Poolaw,* 67 F.3d at 834.

Here, the great weight of evidence in the record points to the conclusion that the only advantage to M.L. of placement in a regular classroom "would be that [he] is sitting next to a nonhandicapped student." *Daniel R.R.,* 874 F.2d at 1049. The Federal Way School District has presented substantial evidence that supports the conclusion that because of M.L.'s extremely limited communication and independent skills, he would receive a greater non-academic benefit from placement in the Wildwood program. Ms. Wicks testified that "it's so critical for M.L. to be around typical children for not only the socialization, but to be around good behavioral models and to learn to imitate good social behavior." However, Dr. Schwartz testified that "based on the evaluations, [M.L.] doesn't seem to have many independent skills, which means that he can't play appropriately, which means that while other children are playing he won't be able to do that." This testimony suggests that M.L.'s lack of communication and independent skills is so severe that even if he is exposed to typically-developing children he would not be able take advantage of the opportunity to learn to imitate their behavior. Dr. Schwartz also explained that the Wildwood program would focus on teaching M.L. how to work independently, apart from a one-on-one aide, and would focus on techniques that taught him how to interact with his peers, skills that would not be developed in a regular education classroom. The ALJ found Dr. Schwartz's testimony credible and M.L.'s parents have not presented any contradictory evidence.

We cannot interpret the preference toward mainstreaming to require the Federal Way School District to enroll M.L. in a regular education classroom, when to do so would result in a failure to meet the majority of his unique needs. Therefore, the second *Rachel H.* factor weighs in favor of placing M.L. in the Wildwood program.

### C.

■ Although M.L.'s parents admit that M.L. bites, kicks, and bruises his caretakers, they assert that "the fact that M.L. occasionally is aggressive towards his assigned aide does not mean that such conduct will require the attention of the regular teacher in the classroom." In addition, they contend that M.L. is only aggressive when he is prevented from interacting with other children and that there has only been one incident in three years when M.L. was aggressive towards another student. In order to determine whether a disabled child has a negative effect on a regular classroom, the test is not whether the student is violent, it is whether he or she is "disruptive, distracting or unruly...." *Rachel H.,* 14 F.3d at 1401.

■ If M.L. would be " 'so disruptive in a regular classroom that the education of other students is significantly impaired, [his] needs ... cannot be met in that environment. Therefore regular placement would not be appropriate to his ... needs.' " 34 C.F.R. § 300.552 Cmt. (quoting 34 C.F.R. Part 104, App. A). *See also* 34 C.F.R. Pt. 104, App. A (interpreting 34 C.F.R. § 104.34) (same). If a student continuously exhibits aggressive and distracting behaviors such as tantrums or physical aggression, a school district may reasonably conclude that the student would have a detrimental effect on the regular classroom. *See Seattle Sch. Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1497 (9th Cir.1996) (holding that it was appropriate to place a child who "exhibited frequent behavioral problems, including physical and verbal aggression, oppositionality, tantrums, attention difficulties, and the showing of inappropriate affection toward adults" in a special education program); *Clyde K.,* 35 F.3d at 1402 ("While school officials have a statutory duty to ensure that disabled students receive an appropriate education, they are not required to sit on their hands when a

disabled student's behavioral problems prevent both him and those around him from learning.").

In addition to biting, kicking and bruising others, M.L. has a history of whining, crying, and throwing tantrums. The record contains evidence that M.L. "scored greater than the 98th percentile for disruptive behaviors." Lai Doo, M.L.'s in-home therapist, testified that M.L.'s "level of aggression seem[ed] to be a lot more severe than the others that [she had] seen." Dr. Schwartz concurred that M.L. would likely distract or threaten the safety of other students. The overwhelming evidence in the record supports the district court's conclusion that M.L.'s parents' "characterization of M.L.'s behavior as a mere distraction is disingenuous," and that "even if M.L.'s aggressive and disruptive behavior will be directed solely towards his instructors and caretakers ... M.L.'s disruptive presence in the classroom would likely impair the education of the normally developing children." Therefore, the third *Rachel H.* factor weighs against placing M.L. in a regular education classroom. A balance of the three relevant *Rachel H.* factors supports the conclusion that the Federal Way School District did not violate the IDEA's mainstreaming requirement by placing M.L. in a self-contained classroom.

### VII.

■ M.L.'s parents assert that the Federal Way School District's "failure to take action to prevent continued teasing of a disabled child" denied M.L. a FAPE. M.L.'s parents argue that there is uncontradicted evidence in the record that the Federal Way School District was deliberately indifferent to C.D.'s reports that her child was being teased. They maintain that the teasing resulted in a denial of a FAPE. Neither the statute nor any court

has directly addressed the question whether unremedied teasing can constitute a denial of a FAPE. *Cf. Charlie F. ex rel. Neil F. v. Bd. of Educ. of Skokie Sch. Dist. 68,* 98 F.3d 989, 990, 993 (7th Cir.1996) (remanding action brought by parents under, *inter alia,* § 1983 to the district court for failure to exhaust the IDEA's administrative remedies and concluding that when a teacher "repeatedly invited her pupils to express their complaints about [the student] ... [which led] to humiliation, fist-fights, mistrust, loss of confidence and self-esteem, and disruption of [his] educational progress" "that at least in principle relief is available under the IDEA").

▮▮▮ Under the IDEA, a disabled child is guaranteed a FAPE, 20 U.S.C. § 1412(1), which "'provide[s] *educational benefit* to the handicapped child.'" *Gregory K.,* 811 F.2d at 1314 (quoting *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034) (emphasis added). If a teacher is deliberately indifferent to teasing of a disabled child and the teasing is so severe that the child can derive no benefit from the services that he or she is offered by the school district, the child has been denied a FAPE. *Cf. Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (holding that to violate Title IX "harassment ... [must be] so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit").

The record shows that by removing M.L. from Mark Twain Elementary School after only five days, M.L.'s parents failed to give the Federal Way School District a reasonable opportunity to find a way to end the teasing of M.L. M.L.'s parents have also failed to demonstrate that teasing resulted in the loss of an educational benefit. M.L.'s parents have offered no evidence that the teasing affected M.L. or interfered with his education. As noted above, C.D. testified that during one of the teasing incidents M.L. was "happy as a little lark." C.D. also stated that during another episode "because he had his headphones on most of the time he was being teased ... [she] didn't know if he even heard it."

M.L.'s parents contend, without evidentiary support, that unpunished teasing "can easily escalate from mere verbal abuse, to physical or sexual abuse" and is "potentially dangerous." M.L.'s parents also argue that teasing poses a particular danger to M.L. since, because he has little or no verbal skills, he would be unable to report any physical abuse. However, M.L.'s parents have not directed this court's attention to any violence, or threat of physical contact, between a student and M.L. M.L.'s parents have not adduced sufficient evidence to show that M.L. was denied a FAPE by the Federal Way School District's alleged failure to stop the teasing.

### CONCLUSION

We hold that the Federal Way School District's failure to include a regular education teacher on the IEP team when there was a possibility that M.L. might be included in a regular education classroom was a procedural violation of the IDEA. However, since the violation did not result in a loss of an educational opportunity for M.L., the Federal Way School District's failure to include a regular education teacher on the IEP team did not violate the IDEA.

We also hold that by articulating the academic expectation that kindergarten students will learn to read, the Federal Way School District did not determine M.L.'s placement based on a rigid policy or criteria.

The record shows there would be little to no benefit to placing M.L. in a regular

education classroom. In contrast, the program offered in the self-contained classroom would offer him substantial benefits in all developmental areas. After balancing the three relevant *Rachel H.* factors, we conclude that the Federal Way School District did not violate the IDEA's mainstreaming requirement by placing M.L. in a selfcontained classroom.

Finally, we conclude that if a teacher is deliberately indifferent to teasing of a disabled child and the teasing is so severe that the child can derive no benefit from the services offered by the school district, the child has been denied a FAPE. However, the record in this case does not support the conclusion that either the teacher or the Federal Way School District were deliberately indifferent to any teasing or that teasing denied M.L. an educational opportunity.

The district court's decision granting the Federal Way School District's motion for summary judgment is AFFIRMED.