Robert and Natalie **FISHER**, as parents of Thomas, a minor[1], Defendants Below, Appellants,

v.

The **BOARD OF EDUCATION OF** The **CHRISTINA SCHOOL DISTRICT,** and the Delaware Department of Education, Plaintiffs Below, Appellees.

No. 485,2003.

Supreme Court of Delaware.

Submitted: April 27, 2004.

Decided: Aug. 16, 2004.

---

1. The names of the parents and child are pseudonyms assigned by the Court pursuant to Supreme Court Rule 7.

Neil R. Lapinski, of Swartz Campbell, L.L.C., Wilmington, DE, for Appellants.

David H. Williams (argued) and Jennifer L. Brierley, of Morris, James, Hitchens & Williams, L.L.P., Wilmington, DE, for Board of Education of the Christina School District, Appellee.

Louann Vari, Department of Justice, Dover, DE, for the Delaware Department of Education, Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, and JACOBS, Justices, and HARTNETT, Justice (Retired),[2] constituting the Court en Banc.

BERGER, Justice:

In this case, we consider the applicable standard of review in appeals from educational placement decisions under the Individuals with Disabilities Education Act ("IDEA")[3], and its Delaware counterpart[4]. The Family Court overruled a special education hearing panel's decision that authorized Thomas Fisher to be placed in a private school at public expense. In doing so, the Family Court gave no weight to the panel's findings and conclusions because it found them to be erroneous. We hold that a reviewing court must give "due weight" to the panel's decision, which means that the panel's findings are *prima facie* correct and that deference should be accorded to its assessment of credibility. If the reviewing court rejects the panel's factual findings, it must explain how the record compels that result. We adopt today this "modified *de novo*" standard of review. Based on our review of the record, we uphold the panel's decision and, therefore, the judgment of the Family Court must be reversed.

Factual and Procedural Background

Thomas Fisher, who is now fifteen years old, was first diagnosed as learning disabled in January 1997, when he was in second grade. Thomas's evaluation revealed discrepancies between his ability and achievement in the areas of basic reading skills, written expression, and math. Later, he was diagnosed as dyslexic. In addition, Thomas has Attention Deficit Hyperactivity Disorder (ADHD), Combined Type and Major Depressive Disorder. He started seeing Dr. Carl McIntosh, a psychiatrist, at the beginning of second grade.

In February 1997, the Christina School District prepared an individualized educational program (IEP) for Thomas, which included specific goals and criteria for measuring whether those goals were achieved. For example, in the area of classroom behavior, one objective was that Thomas would follow two-step directions 90% of the time, and, in the area of writing skills, one objective was that Thomas would spell high-utility words with 80% accuracy. The IEP stated that Thomas would be able to achieve the specified goals in a Teaching Approach to Mastery (TAM) classroom, which is a classroom of regular and special education children.

Every year thereafter, the Fishers and School District personnel reviewed Thomas's IEP and agreed upon a new one. Periodic testing indicated that Thomas was making some progress in all identified areas of learning disability until fifth grade. When tested in December 1999, Thomas's score in the area of decoding was 89, which was a grade equivalent of 3.6 (third grade, six months). Given the same test in July 2000, Thomas scored 83, or a grade equivalent of 2.5. Thomas's parents became concerned about his lack of progress and refused to sign the December 2000 IEP. Instead, they requested an independent educational evaluation of Thomas. The

2. Sitting by designation pursuant to DEL. CONST. ART. IV, § 38 and DEL.CODE ANN. tit. 29 § 5610(q)(2)(2001) and DEL. SUPR. CT. R. 2, 4.

3. 20 U.S.C. § 1400 *et seq.* (2000)

4. 14 Del. C. § 3101 *et seq.* (1999 & Supp. 2002).

School District agreed, and Thomas's parents selected Dr. Margaret J. Kay, a nationally certified school psychologist, to perform the evaluation.

According to the tests Kay administered on March 6, 2001, Thomas's decoding and writing skills were regressing. In fifth grade, his writing sample was evaluated by the School District as an average writing sample, with a 4.4 grade equivalency. Almost one year later, Kay found Thomas's writing sample to have a 3.2 grade equivalency. Kay's decoding test result, also, was lower than the School District's. Kay found that Thomas was decoding at a 2.2 grade equivalency, whereas Emma Lynch, a teacher of hearing-impaired students, found his decoding to be at a 3.4 grade equivalency.

In her 38–page report, Kay analyzed Thomas's intellectual ability, academic achievement, social and emotional status. She based her conclusions on the results of numerous tests she administered, as well as information provided by Thomas's teachers, parents, and psychiatrist. Kay opined, in part:

> From an academic standpoint, Thomas is performing commensurate with his overall cognitive capabilities in reading comprehension (when given unlimited testing time) and in mental mathematics reasoning. He evidences severe discrepancies between ability and achievement in the basic reading skill areas of word identification and word attack and in reading fluency. He also evidences severe discrepancies between ability and achievement in the written expression areas of spelling, editing, punctuation, capitalization, penmanship and expository writing. Furthermore, he evidences severe discrepancies between ability and achievement in mathematics calculation and mathematics fluency.

> It is the opinion of this examiner that Thomas has not made a reasonable degree of progress in the public school's program. . . .

> Despite having Thomas as a student for his entire school career, the school district has maintained his placement in an inclusion program, which provided accommodations and assistance but no remediation to improve his functional literacy skills. This has worsened Thomas's situation overall and has resulted in secondary behavior concerns.

> \* \* \*

> Although the school district could have provided Thomas with an appropriate program and placement beginning in the first grade, this was never offered. Rather, the district continued to cling to its inclusion model as the only available option under the least restrictive environment criteria for program and placement.

> However, the inclusion program model did not take into account Thomas's dyslexia and did not afford Thomas an appropriate program of specially-designed instruction. Therefore, the district failed to meet its obligation to provide an appropriate IEP for Thomas and intensive remediation is now required in a small structured educational setting specifically geared to meet the needs of students with Language–Based Learning Disorders of the Dyslexic Type.

Kay recommended, among other things, that Thomas receive at least three periods per week of one-to-one instruction, using the Wilson Reading System to improve decoding and spelling; daily small group instruction in writing skills; instruction by a speech and language therapist in phonological processing and memory; and behavior management training.

After receiving Kay's report, Thomas's parents requested a Special Education

Due Process Hearing, alleging that the School District failed to provide their son with a free, appropriate public education ("FAPE"). Thomas's parents requested that he be placed in the College School at public expense. The administrative panel, consisting of an educator, a lay person, and an attorney, conducted a seven-day hearing during which more than a dozen educational and/or psychological professionals described Thomas's special needs and his education to date. Two members of the panel concluded that Thomas had been denied FAPE and that he should be allowed to attend the College School for two years at the School District's expense.

The majority noted that Thomas had been placed in a TAM classroom because that was the only setting the School District offered to integrate learning disabled students with regular learning students. For the same reason, he was taught the Distar reading program, even though it was not designed to address decoding problems after third grade. The majority also noted that Thomas's special education teacher was on maternity leave for the first half of sixth grade and that the substitute was not certified in special education. During that year, Thomas's behavior problems were increasing; he was falling behind in his classwork; and he was missing science class to receive decoding lessons in the hall.

Relying on the report of a learning disabilities specialist, the majority found that Thomas could overcome his dyslexia with proper instruction in decoding and encoding. The majority reviewed, and apparently accepted, Kay's evaluation of Thomas's needs and his lack of progress in the School District. The attorney-member of the panel dissented, without making any

contrary factual findings. He simply stated that, "[t]he evidence showed that Thomas Fisher was provided educational instruction with sufficient support services to permit him to benefit educationally from that instruction."

The School District appealed to the Family Court. Without hearing any additional evidence, the Family Court reversed the panel's decision, holding that it "erroneously assessed the facts... [and] incorrectly applied the law to those facts." This appeal followed.

### Discussion

A. Legal Background

The IDEA represents "an ambitious federal effort to promote the education of handicapped children." [5] Its purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." [6] Among other things, the IDEA provides the states with federal funding for specialized education services to assist eligible disabled children. In conformity with applicable federal guidelines, the State of Delaware administers those funds through the Delaware Department of Education and its local school systems. For each child in need of special education assistance, the State of Delaware convenes an IDEA case conference between the child's parents and local officials to tailor an IEP that identifies goals and objectives designed to address the child's special needs.

 The IEP, when implemented, must provide the student with a free ap-

---

5. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

6. 20 U.S.C. § 1400(d)(1)(A).

propriate public education (FAPE).[7] A free appropriate public education is one "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." [8] An "appropriate" public education does not mean the absolutely best or "potential-maximizing" education available.[9] The states are obliged to provide "a basic floor of opportunity" through a program "individually designed to provide educational benefit to the handicapped child." [10] If a state fails to satisfy this statutory mandate, parents have a right to reimbursement for private school tuition.[11]

## B. Standard of Review

■ This case presents two "standard of review" questions: 1) what is our standard of review in considering the trial court's decision; and 2) what is the trial court's standard of review in considering the panel's decision. In this case, where the trial court did not hear any evidence, our standard of review mirrors that of the trial court. "Where there is a review of an administrative decision by both an intermediate and a higher appellate court and the intermediate court received no evidence other than that presented to the administrative agency, the higher court does not review the decision of the intermediate court but, instead, directly examines the decision of the agency." [12]

■ The answer to the second question is not as simple. In reviewing a panel decision, the relevant statute requires the court to: (1) receive and review the record of the administrative hearing; (2) hear additional evidence at the request of a party; and (3) grant such relief as the court deems appropriate, based on a preponderance of the evidence.[13] "Both the receipt of evidence by the reviewing court and the preponderance standard of proof are features alien to ordinary judicial review of administrative action..." [14] In light of these features, several courts have applied a "modified *de novo*" standard of review.[15] We adopt this standard, which is fairly articulated as follows: The panel's findings of fact are considered *prima facie* correct. The Panel's decision must be given due weight; [16] and its witness credibility determinations "deserve deference unless ... the record read in its entirety

7. *See* 20 U.S.C. § 1400(d)(1)(A); 14 Del. C. § 3120.

8. *Rowley*, 458 U.S. at 188–89, 102 S.Ct. 3034.

9. *Id.* at 197 n. 21, 200, 102 S.Ct. 3034.

10. *Id.* at 201, 102 S.Ct. 3034.

11. *See* 14 Del. C. § 3124, *Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

12. *Stoltz Management Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del.1992) *quoting Baker v. Connell*, Del.Supr., 488 A.2d 1303, 1309 (1985); *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325 (4th Cir.2004); *Todd v. Duneland School Corporation*, 299 F.3d 899, 904 (7th Cir.2002).

13. 14 Del. C. § 3142. The federal statute is essentially the same. *See* 20 U.S.C. § 1415(i)(2)(B).

14. *School Dist. of Wisconsin Dells v. Z.S. ex rel. Littlegeorge*, 295 F.3d 671, 675 (7th Cir. 2002).

15. *See, e.g., M.L., C.D. and S.L. v. Federal Way School District*, 341 F.3d 1052, 1061 (9th Cir. 2003); *S.H. v. State–Operated School District of City of Newark*, 336 F.3d 260, 270 (3rd Cir.2003); *M.M. ex rel. D.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530 (4th Cir.2002).

16. *M.M. ex rel D.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 531 (4th Cir.2002) quoting *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir.1997).

would compel a contrary conclusion." [17] If the reviewing court does not accept the panel's findings, it must explain why; and in conducting its review of the panel's decision, the court should not substitute "[its] own notions of sound educational policy for those of the school authorities . . . ." [18]

## C. Application of the Standard of Review

■ The record in this case amply supports the majority's conclusion that Thomas was denied FAPE and that he should be placed at the College School at School District expense. It reveals, among other things, that:

1) Thomas is a bright child who has the potential to graduate from college and pursue a professional career. Unfortunately, according to Thomas's psychiatrist, he also is a child at "significant risk for a social downward drift . . . . [a risk of] gravitating towards people, places, impulses, things that are going to get him legal problems, substance abuse problems . . . ."

2) Because of his ADHD, Thomas has difficulty staying on task and is distracted by noise and his surroundings. He should be taught in a small group environment, preferably with 8 or less children. The TAM classroom provided by the School District had approximately 30 children, including approximately 10 special education students and 20 regular students. Thomas was called out of the classroom and taught special education subjects in the hallway. As a result, Thomas missed science and social studies classes twice a week in order to work on decoding.

3) There were some discrepancies between Thomas's scores on standardized tests and assessments based on objectives listed in his IEPs. In the area of spelling, for example, one objective for fifth grade was that Thomas be able to spell a weekly list of 25 words with 90% accuracy. He apparently achieved that objective. Yet, on a standardized achievement test, his spelling at the end of sixth grade was at a third grade level. According to the School District's education diagnostician, Susan Corey, the curriculum-based evaluations of Thomas's progress were higher than his standardized test scores because Thomas had a chance to study the words he was asked to spell in the classroom. Also, in administering Thomas's tests, the School District made accommodations, such as: rereading directions, extending time, allowing him to complete the test over several sessions, using a tape recorder or test administrator to record answers, and reading him passages of text.

4) Thomas's IEPs included basically the same objective in language arts from third grade through sixth grade: to write 5–7 sentences on a given topic with 80% accuracy. The third grade IEP listed his current level at 2.2; the fourth grade IEP listed his writing skills at approximately 2.1; the fifth grade IEP listed his written expression at fourth grade level; and the sixth grade IEP listed his written expression at 3.5 instructional level.

5) Thomas's decoding test score went down slightly between December 1999 and July 2000. Whether that decrease is characterized as a "plateau" or a regression, it is noteworthy in light of the importance of decoding as a component of reading. Lynch explained that decoding is the ability to pronounce written words, whether or not they are familiar. "Sight-word read-

17. *Carlisle Area School v. Scott P. By and Through Bess P.,* 62 F.3d 520, 528 (3rd Cir. 1995).

18. *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

ers," like Thomas, do not use decoding skills to read. Rather, they memorize the shape of a word, or some unique feature in it. That approach only works for a short time, however, as there is a limit to how many words a person can memorize. As the person's sight vocabulary grows, his or her capacity to learn new words diminishes. Moreover, sight-word readers are limited to the words that they have memorized; they cannot make sense of unfamiliar words. Thus, a decoding weakness becomes more noticeable as the reading material becomes more complex.

In sum, Thomas's test scores in critical areas, such as decoding, demonstrated that he was not making any progress in mastering the fundamental components of reading. He was being distracted by the large number of students in his class, and was forced to miss science and social studies classes in order to receive special phonics instruction. His "progress" in areas such as spelling and writing was more a function of the School District's accommodations than any real improvement in mastering the subject.

We are not unmindful of the fact that the record includes conflicting evidence and expert opinions. The panel heard the experts' explanations of the tests that were given; the significance of the scores; and the basis for their conclusions. The panel accepted Kay's analysis and rejected the opposing opinions. Under the modified de novo standard of review, this Court defers to the panel, which heard the testimony and was best able to assess the credibility of the witnesses. After reviewing the record, and deferring to the panel's credibility determinations, we are satisfied that a preponderance of the evidence supports the conclusion that Thomas did not receive a meaningful educational benefit from the program provided by the School District.

Finally, we note that the Family Court concluded that the panel incorrectly applied the law to the facts. Although the majority apparently did not have the assistance of a lawyer in drafting its decision, nonetheless, it did cite several cases, including *M.C. on Behalf of J.C. v. Central Regional School District*,[19] which followed *Rowley's* legal standards and held that:

> [A] school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a *de minimis* educational benefit must correct the situation. If it fails to do so, a disabled child is entitled to compensatory education....

The majority found that Thomas's "needs have been well known to the school district for years, yet despite his failure to make a reasonable degree of educational progress within the school district's inclusion program, the district provided minimal changes to his IEP and never offered a program of intensive remediation to promote the development of essential literacy skills." Based on that finding, the majority concluded that Thomas was entitled to compensatory education for two years at the College School. We find no legal error in the majority's findings of fact or its application of the law to those facts.

## CONCLUSION

Based on the foregoing, the judgment of the Family Court is REVERSED and the decision of the special education hearing panel that Thomas was denied FAPE and is entitled to compensatory education is reinstated. This matter is remanded for action in accordance with this opinion.

19. 81 F.3d 389, 397 (3rd Cir.1996).